438 So.2d 787 (1983)
Theodore HARRIS, Appellant,
v.
STATE of Florida, Appellee.
No. 61343.
Supreme Court of Florida.
September 8, 1983.
Rehearing Denied November 8, 1983.
*789 Harold Long, Jr., Miami, for appellant.
Jim Smith, Atty. Gen. and Calvin L. Fox, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
The appellant, Theodore Harris, was convicted of first-degree murder, burglary with an assault, and robbery. The trial judge imposed the death sentence for the murder conviction in accordance with the jury's advisory recommendation and imposed sentences of one hundred years each for the burglary and robbery convictions. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the convictions, the death sentence, and the sentences of imprisonment.
A full statement of the facts in this case, including the circumstances surrounding Harris's confession, is necessary to our discussion of the issues raised by Harris in this appeal. The victim, a seventy-three-year-old woman, was found dead in her home on the morning of Sunday, March 22, 1981. She had died during the night from multiple stab wounds and wounds inflicted by a blunt instrument. A knife, a bloody rock, and a blood-covered wooden chair were found in the house. The autopsy revealed that the victim had suffered numerous defensive wounds on her arms, hands, and shoulders. Blood was spattered over the walls and furnishings of the bedroom, living room, and kitchen, indicating that the victim had tried to escape her assailant while she was being stabbed and beaten.
While police officers were investigating at the scene of the murder, they were approached by Lionel Cook, who indicated that he suspected that Harris might be involved in the crime. At the time of the murder, Harris was living with Cook and his wife, the victim's granddaughter, in the same general neighborhood as the victim. Harris knew the victim, having attended a dinner at her house on a previous occasion, and having been previously married to Mrs. Cook's sister. Cook told the police that Harris had taken his wife's car late on Saturday night and that he had not returned it. Cook said that one of the staff of Jackson Memorial Hospital called him early Sunday morning to tell him that Harris had been hospitalized with a severely lacerated hand and that, when he went to the hospital to pick up his wife's car, he saw Harris and took Harris's personal effects from the hospital. He turned the personal effects over to the police on Sunday evening, along with two bloody towels he had found in his wife's car.
The police interviewed Harris in the hospital late Sunday night. At this interview, Harris stated that his hand had been cut the night before when two men attacked him in the parking lot of a bar and tried to steal a gold chain from around his neck. He explained that, in trying to defend himself against a knife attack, he grabbed the blade to deflect it from his body.
The police investigated further, focusing on Harris as a suspect. They examined the parking lot where Harris claimed he had been attacked, but they did not discover any trace of blood or any evidence of a scuffle. The chief investigating officer talked with the doctor who treated Harris's hand, and it was the doctor's opinion that the wounds could have been caused by the hand sliding down over the handle of a knife onto the blade while Harris was wielding the knife in a stabbing motion. Laboratory analysis showed that two types *790 of blood were present in the victim's house, type A and type O. The victim had type O blood; Harris's blood was type A, and it had further characteristics that made it consistent with the type A blood found at the scene. Four partial fingerprints were found in the victim's house, but none was identified as belonging to Harris. Analysis of Harris's clothing revealed the presence of type A blood, but none of the blood on these articles of clothing was ever identified as being of the victim's blood type.
The police obtained a warrant on April 7 and arrested Harris on April 14, approximately three weeks after the murder. At the time of his arrest, Harris had a cast on his right forearm that interfered with his wrists being handcuffed behind his back, as police regulations required, so the police handcuffed his right elbow to his left wrist behind his back. Harris was interrogated at the police station from 1:00 p.m. to 7:00 p.m. During this time, he was handcuffed and sat in an aluminum chair. He did not receive either food or drink during the interrogation. The investigating officers testified that Harris was calm and matter-of-fact about everything and made no complaints about the handcuffs or his treatment.[1] He consistently denied his involvement in this murder until about 7:00 p.m., when he said, "All right, I'll tell you the truth." After giving an oral statement, Harris signed a written confession which was introduced into evidence at trial.[2] *791
*792 The evidence presented at trial reflected three unexplained circumstances. First, police had discovered a brown paper bag in the victim's bedroom which held a plastic bag containing four hundred dollars in cash. Type A blood was found on the brown bag, but Harris said that he didn't find the bag and that, if he had, he would have taken the money. The victim's empty wallet and a knife were found in the victim's kitchen, but Harris, in his oral statement to one of the investigating officers, denied going into that room. Finally, Harris stated in his written confession that he left the victim's house through the front door although the police had found an open bedroom window from which the screen had been removed, with smears of blood on the outside of the house under the window.
Harris did not testify nor did the defense call any witnesses in the trial phase of the proceeding. The case was presented to the jury by defense counsel on the theory that the confession should not be believed because it was involuntary and that, without the confession, the state had failed to establish beyond a reasonable doubt that Harris had committed this offense. At the charge conference, defense counsel requested that no instructions be given to the jury regarding lesser included offenses for any of the crimes charged. The trial court, before agreeing not to include the required lesser-included-offense instructions, questioned Harris and obtained an unambiguous waiver from Harris of his right to have these instructions given. The jury returned a verdict of guilty to all counts as charged.
In the sentencing phase, the state presented medical testimony concerning the nature and extent of the injuries sustained by the victim, as well as expert opinion testimony regarding the pain experienced by the victim as a result of her wounds. Additional testimony was presented by the state to establish that Harris had previously been convicted of robbery and to confirm that Harris was on parole at the time of the murder. Harris presented no evidence in mitigation or rebuttal during the penalty phase. The jury returned a verdict recommending the imposition of the death sentence.
The trial judge imposed the death sentence, finding the following aggravating circumstances: (1) that Harris was under a sentence of imprisonment when he committed the murder; (2) that he had previously been convicted of a felony involving violence; (3) that the murder was committed while Harris was engaged in committing a robbery or burglary; (4) that the murder was especially heinous, atrocious, and cruel; and (5) that the murder was committed in a cold, calculated, and premeditated manner. The trial judge found a "complete absence" of any mitigating factors. The trial judge also sentenced Harris to one hundred years *793 imprisonment for armed burglary with an assault and one hundred years for robbery with a deadly weapon, with the sentences to be served consecutively.

Trial Phase
Appellant contends that his convictions should be reversed because: (1) his confession should have been suppressed on the grounds that it resulted from an unlawful arrest and that it was involuntary; (2) the prosecutor made improper comments during closing argument concerning appellant's silence at trial; and (3) the trial judge erroneously denied a requested jury instruction on inculpatory statements and failed to properly instruct the jury on necessarily included lesser offenses to the crimes charged. For the reasons stated, we reject each of these contentions.

Admissibility of the Confession
Appellant first contends that his confession should have been suppressed because it resulted from his unlawful arrest and was part of an uninterrupted chain of events following that arrest. See Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In attacking his arrest on the basis of Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), appellant asserts that the arrest warrant was not supported by probable cause because the sworn affidavit upon which the warrant was issued contained factual misrepresentations and inaccuracies. At an evidentiary pre-trial suppression hearing, these allegedly incorrect factual statements of the police-officer affiant were presented to the trial court, which found
that there was no deliberate falsity or reckless disregard by the investigating police agencies. Here, at best, there was a possible negligence or innocent mistake concerning a blood typing and evidence on that regard.
Moreover, assuming arguendo, there even was a falsity or disregard, there remains sufficient contents within the warrant affidavit to support a finding of probable cause.
We agree with the trial judge and find that he scrupulously adhered to the requirements of Franks, as well as to the dictates of this Court in Antone v. State, 382 So.2d 1205 (Fla.), cert. denied, 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980), in concluding that the arrest was supported by probable cause and that, even assuming there was falsity, the remaining contents of the affidavit were legally sufficient to support the arrest warrant. Since the arrest was lawful, there is no need to consider whether the causal chain between the arrest and the confession had been broken.
Appellant next contends that the admitted facts in this record establish that the confession was involuntary. At the suppression hearing, appellant testified to his version of the police interrogation following his arrest. He claimed that he was questioned against his will for over six hours; that he was handcuffed elbow-to-wrist the entire time; that he was refused food and drink; that he was not allowed to go to the bathroom; and that he was subjected to emotional and physical abuse. The police officers in charge of the investigation testified that appellant was questioned for six hours in a small room in the police station and that he was handcuffed and seated in an aluminum chair. The officers denied that the appellant had been mistreated in any way and testified affirmatively that he did not complain of discomfort or of the circumstances of his interrogation. The stenographer who took the confession and reduced it to writing for appellant's signature testified that she did not see or hear any abuse of appellant or see any evidence of such abuse. Appellant signed the written confession after pointing out and initialing one correction.
The trial court made a detailed finding of fact in its order, addressing each of appellant's complaints. The court concluded that appellant was not beaten, threatened, or coerced in any manner and that the confession was freely and voluntarily made. Appellant did not testify at trial, but substantially all of the facts concerning the voluntariness of the confession presented during *794 the hearing on the motion to suppress were presented to the jury through the state's witnesses. Even though the police procedure utilized in appellant's interrogation could have destroyed the admissibility of this confession, we conclude on the record as a whole that there is substantial competent evidence to affirm the trial judge and the jury in their conclusion that this confession was voluntary.

Prosecutor's Comments
Appellant asserts that the prosecutor improperly commented during closing argument on appellant's failure to testify at trial by stating:
I submit to you this was a voluntary statement taken after a considerable period of time in which he sat there and remained the same immobile, unemotional self as he has this entire trial.
We acknowledge the established law that comments on the accused's failure to testify violate the privilege against self-incrimination of the fifth amendment. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). We have recognized in Florida that such a comment requires the reversal of a conviction and that the harmless error rule does not apply. David v. State, 369 So.2d 943 (Fla. 1979); Trafficante v. State, 92 So.2d 811 (Fla. 1957). See also Fla.R.Crim.P. 3.250 (formerly § 918.09, Fla. Stat. (1969)). We find, however, that these principles are inapplicable to the circumstances of this case, and we reject the argument that the quoted comments were improper.
A full reading of the prosecutor's argument establishes without question that he was not referring to appellant's failure to testify at trial. The prosecutor, in fact, was addressing the critical issue of whether appellant's confession was voluntary and, in doing so, was commenting on appellant's demeanor at the time the confession was made. To understand the challenged statement, it is necessary to review the entire argument on this issue. In the transcript, the argument of the prosecutor reads as follows:
You have got to be concerned about the voluntariness of the statement; whether it was freely and voluntarily made in order to rely on the statement.
Again, you have other evidence to work with, but we are looking exclusively at the statement here.
There is nothing in the statement that indicates that it is not freely and voluntarily given. You can look at the photographs that have been introduced of the Defendant immediately after post-statement taking and you can see that the photographs indicate a man who looks exactly the same except for, perhaps, some minor change in the combing of his hair.
There are no injuries on Mr. Harris there. They didn't beat him or threaten him.
If they had beat or threatened him, the statement that he would have given would have tracked exactly what Parmenter wanted him to say, but it didn't.
How can you say the statement wasn't voluntary when the man goes through the statement and he initials every page of the statement and he makes certain corrections on the statement. He says certain things in the statement which indicate that he is expressing himself in a narrative sort of way and he is asked questions such as: What was your purpose of going into the house or what were your activities inside the house, and certainly those are broad and general enough questions for the Defendant to be able to respond to. These are his words.
I submit to you this was a voluntary statement taken after a considerable period of time in which he sat there and remained the same immobile, unemotional self as he has this entire trial.

This is the type of person he is. This is the type of individual that could do something like he did in this case to Essie Daniels.
... .
... There is nothing in this statement which would indicate that statement was *795 anything but freely and voluntarily given.
(Emphasis added.) It is obvious that the prosecutor was describing to the jury the appellant's demeanor during his interrogation by comparing it to appellant's demeanor as he appeared before them at the trial. We find that this comment does not violate appellant's fifth amendment rights nor does it violate the case law or the rules of procedure of this state.

Jury Instructions
Appellant argues that the trial judge improperly refused to grant his request that the following jury instruction on inculpatory statements be given:
Any confession given by a Defendant should be acted upon by both the Court and the jury with great caution, especially where the party is under arrest when the confession is made.
The trial judge denied the request for this instruction on the basis that the standard jury instruction on an accused's out-of-court statements adequately covered the matter. The standard jury instruction, as given in the trial, reads as follows:
A statement claimed to have been made outside of this Court has been placed before you. Such a statement should always be considered with caution and be weighed with great care to make certain it was freely and voluntarily made; therefore, you must determine from the evidence that the Defendant's alleged statement was knowingly, voluntarily and freely made.
In making this determination, you should consider the total circumstances including by [sic] not limited to:
One: Whether when the Defendant made the statement he had been threatened in order to get him to make it, and two, whether anyone had promised him anything in order to get him to make it.
If you conclude the Defendant's out of Court statement was not freely and voluntarily made, you should disregard it.
Fla.Std.Jury Instr. (Crim.) 2.04(e). We fully agree with the trial judge that the standard jury instruction adequately covers the subject. Further, the record reflects that appellant's counsel did not object to the instruction as given, and, because no objection was made in accordance with Florida Rule of Criminal Procedure 3.390(d), we find that appellant waived his right to challenge the instruction on appeal.
Appellant next contends that the trial judge committed reversible error when he failed to give to the jury the mandatory instructions on the necessarily included lesser offenses of first-degree murder, burglary, and robbery. Appellant argues that our holdings in Brown v. State, 206 So.2d 377 (Fla. 1968), State v. Washington, 268 So.2d 901 (Fla. 1972), and Rayner v. State, 273 So.2d 759 (Fla. 1973), mandate a trial judge to give jury instructions on all necessarily included lesser offenses. He maintains that the trial judge did not have the discretion to grant defense counsel's request that these instructions not be given or to accept appellant's waiver of the instructions.
The record in this cause reflects that appellant, through his counsel, made a specific request that no instructions on necessarily included lesser offenses be given. The trial judge took meticulous care to make sure that appellant knew of this request and had appellant personally make an express oral waiver of his right to these instructions. The colloquy between the trial judge and appellant's counsel reflects the following:
MR. WILLIAMS: For the record, pursuant to conversations with our client, we have decided and at this time we would be asking for no lessers and we ask that it be sent to the jury as charged.
THE COURT: So the record is clear, you are not asking for any lessers under the first-degree murder, any lessers under burglary nor any lesser under the armed robbery charge?
MR. WILLIAMS: No.
THE COURT: Is that correct?
MR. WILLIAMS: Yes.
... .
THE COURT: Is it the Defendant's position, notwithstanding the fact that second, third and manslaughter are not *796 going to be given as lessers, that even  that there should be no explanation of lesser included under any circumstances? Do you agree with that?
MR. WILLIAMS: We agree with that, Judge.
... .
THE COURT: Since this is unusual, I want to cover one thing for the record.
The Defendant is agreeing and stipulating that they are not requesting any lesser includeds; right?
MR. WILLIAMS: That's correct.
The colloquy between the trial judge and appellant relating to his waiver of the instructions consisted of the following:
THE COURT: Mr. Harris, have your lawyers explained to you what a lesser included crime is?
THE DEFENDANT: Yes.
THE COURT: For example, on the crime of murder, you understand the penalty is either death or life and there are certain lesser included crimes which include second-degree murder which is punishable by probation to life imprisonment; third-degree, probation to 15 years, and manslaughter, 15 years.
Do you understand that? Your attorneys have indicated they do not request any lesser included crimes.
THE DEFENDANT: Yes.
THE COURT: Is that your choice?
THE DEFENDANT: Yes, sir.
In Brown v. State, this Court construed an existing statute and held that "a trial judge is required to instruct on necessarily included offenses because the law, particularly § 919.16, requires it."[3] 206 So.2d at 382. This Court has consistently held that, upon a proper request, a trial judge must give jury instructions on necessarily included lesser offenses, that a refusal of such a request constitutes fundamental error when properly preserved for appeal by timely objection under Florida Rule of Criminal Procedure 3.390(d), and that the harmless error rule does not apply. See, e.g., Reddick v. State, 394 So.2d 417 (Fla. 1981); State v. Abreau, 363 So.2d 1063 (Fla. 1978); State v. Thomas, 362 So.2d 1348 (Fla. 1978); Lomax v. State, 345 So.2d 719 (Fla. 1977).
In State v. Washington, the accused's counsel objected to the trial judge giving the jury the instructions on necessarily included lesser offenses but the trial court gave them anyway. The district court held that the trial judge should not have given the instructions over the accused's objections. This Court reversed, finding that "[t]he trial judge in the instant case ... properly instructed the jury as to lesser included offenses." 268 So.2d at 902. This holding was reaffirmed in Rayner v. State, 273 So.2d 759 (Fla. 1973), and in Williams v. State, 285 So.2d 13 (Fla. 1973). In none of these cases did the defendant expressly waive his right to have such instructions given.
Our decisions holding that a defendant is entitled to have the jury instructed on all necessarily included lesser offenses are consistent with the holdings of the federal courts. For instance, in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the United States Supreme Court held that a state cannot prohibit the giving of lesser-included-offense *797 instructions in a death case without violating the United States Constitution. This procedural right to have instructions on necessarily included lesser offenses given to the jury does not mean, however, that a defendant may not waive his right just as he may expressly waive his right to a jury trial. Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930); Davis v. State, 159 Fla. 838, 32 So.2d 827 (1947); Fla.R.Crim.P. 3.260. But, for an effective waiver, there must be more than just a request from counsel that these instructions not be given. We conclude that there must be an express waiver of the right to these instructions by the defendant, and the record must reflect that it was knowingly and intelligently made.
We hold that, upon the facts in this case, appellant knowingly and intelligently waived his right to instructions on necessarily included lesser offenses, and he cannot now argue that the trial judge should have given the instructions.

Penalty Phase
Regarding the penalty phase, appellant contends (1) that the prosecution made an improper comment in his closing argument, and (2) that the trial judge improperly applied two aggravating circumstances.
Appellant argues that the jury's death sentence recommendation was tainted by an improper comment of the prosecution during closing argument in the sentencing hearing, when the prosecutor stated:
The Defense may tell you, Well, 25 years is a long time, 25 years without eligibility for parole, but I can tell you this: That in 25 years this 27 year old Defendant will be 52 years old. He will walk out of prison as he walked out of prison before.
Defense counsel objected, and the trial judge sustained the objection and cautioned the jury to disregard the comment. Defense counsel also made a motion for a mistrial, which was denied by the trial judge. Appellant argues that, notwithstanding the cautionary instruction, the jury was improperly influenced by the prosecutor's inference that, unless the jury recommended the death sentence, appellant would be released from prison in twenty-five years. We reject this contention and find that the comment expresses not much more than what is in the statute itself and in the instructions explaining to the jury the alternatives it has in advising the court of the appropriate sentence.
The comment in this case is not at all similar to the language we condemned in Teffeteller v. State, ___ So.2d ___ No. 60,337 (Fla. Aug. 25, 1983). In Teffeteller, the prosecutor gave a lengthy and explicit lecture to the jury on the consequences of a life sentence for the defendant in that case and also repeatedly told the jury that the defendant would kill again if he was ever released from prison. We found that this type of comment was "inexcusable prosecutorial overkill" which mandated a new sentencing hearing before a new jury. Although we agree with the trial judge in the instant case that the prosecutor's comment should not have been made because it was not a fair comment either in rebuttal or upon any of the aggravating or mitigating factors, we also agree that it was not so prejudicial as to require a mistrial. In particular, we note that the comment in the instant case contained no assertion that appellant would kill again and no lengthy lecture to the jury on the consequences of a life sentence for this defendant.
The trial judge, finding five aggravating and no mitigating circumstances, agreed with the jury that the death sentence should be imposed. Appellant asserts that the trial judge improperly found (1) that the murder was heinous, atrocious, and cruel, and (2) that it was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. We find that the record clearly justifies a finding that this murder was heinous, atrocious, and cruel. We must, however, agree that the state failed to establish beyond a reasonable doubt that this murder met the requirements of having *798 been committed in a cold, calculated, and premeditated manner, as we have defined this aggravating circumstance. This aggravating circumstance was not, in our view, intended by the legislature to apply to all premeditated-murder cases. See Bolender v. State, 422 So.2d 833 (Fla. 1982), cert. denied, ___ U.S. ___, 103 S.Ct. 2111, 77 L.Ed.2d 315 (1983); Mann v. State, 420 So.2d 578 (Fla. 1982); McCray v. State, 416 So.2d 804 (Fla. 1982); Jent v. State, 408 So.2d 1024 (Fla. 1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982). In this instance the state presented no evidence that this murder was planned and, in fact, the instruments of the death were all from the victim's premises. The improper finding of this aggravating circumstance does not, however, require a new sentencing hearing since there are still four properly-applied aggravating circumstances and no mitigating circumstances. See Elledge v. State, 346 So.2d 998 (Fla. 1977).
For the reasons expressed, we find the imposition of the death sentence appropriate in this cause. The convictions and sentences are affirmed.
It is so ordered.
ALDERMAN, C.J., and ADKINS, BOYD, OVERTON, McDONALD and EHRLICH, JJ., concur.
NOTES
[1] During direct examination by the state attorney, Detective Parmenter testified to the following:

Q Would you describe the position  the posture of the Defendant during this entire process while you and Detective Turner were taking turns talking to him and then leaving the room and then both going in, both going out? What was he doing that entire length of time?
A He always sat in the same chair.
Q During any of that time period that we're going to be covering here, did the Defendant ever complain to you of discomfort?
A No.
Q Did he ever complain about his hand?
A No.
Q Did he ever ask for anything?
A No.
Q Did he ever make any special requests?
A No.
Q Would you describe his demeanor during this period of time when you and Detective Turner would ask the questions and one or both leave the room?
A It was the same as every time that I had ever talked to him. He was totally calm. Nothing seemed to bother him.
Q For how long a period did this mode of interviewing the Defendant continue prior to the time that he gave any additional statement with respect to this case?
A The entire time from when he first walked in the office until when he eventually changed the story again was six hours.
Q When did the Defendant advise you he was going to change his story?
A At 7:00 P.M.
Q Would you relate to the jury exactly what, if anything, preceded the Defendant determining that he was going to tell you another story, give you another story?
A The same type of questioning there, when was he going to tell us the truth, you know, why was he lying, and he says, "All right, I'll tell you the truth."
[2] The text of Harris's confession is as follows:

Q (By Detective Parmenter) For the record, would you state your full name?
A Theodore Christopher Harris.
Q And your date of birth?
A September 14, 1954.
Q What is your address?
A 1862 West 27th Street.
Q Are you working presently?
A No, I'm not.
Q How far did you go in school?
A Eleventh grade.
Q Can you read and write English?
A Yes.
Q Do you understand the way I'm talking to you right now?
A Yes.
Q Are you under the influence of any narcotics, medication or alcoholic beverage?
A No, sir.
Q Do you know of any reason why you cannot answer my questions intelligently?
A No, sir.
Q Do you recognize this form I'm showing you right now?
A Yes.
Q Is this the Advice of Constitutional Rights Before Interview that I read to you earlier?
A Yes.
Q I'm going to go over this now, and when I ask you questions, you answer, okay?
A Yes.
Q "You have the right to remain silent. You need not talk to me or answer my questions if you do not wish to do so."
Do you understand?
A Yes.
Q "Should you talk to me, anything which you say can and will be introduced into evidence in court against you."
Do you understand?
A Yes.
Q "If you want an attorney to represent you at this time or at any time during questioning, you are entitled to such counsel."
Do you understand?
A Yes.
Q "If you cannot afford an attorney and so desire, one will be provided without charge."
Do you understand?
A Yes.
Q "Do you fully understand the above statement of your rights?"
A Yes.
Q "Are you willing to answer my questions without the presence of an attorney at this time?"
A Yes.
Q "This statement is signed of my own free will, without any threats or promises having been made to me."
And there is a signature there. Is that your signature?
A Yes.
Q And the date is 4-14-81.
A Yes.
Q And the time is 1:09 P.M.
A Yes.
Q Did you write that there?
A Yes.
Q And it is witnessed by myself, John Parmenter, and Detective Roosevelt Turner.
A Yes.
Q Calling your attention to the evening of April [sic] 21, 1981, which was a Saturday night, where were you living at that time?
A 2501 N.W. 158th Street.
Q Is that in Miami?
A Yes.
Q And who were you living with?
A Lionel and Sarah Cook (phonetically).
Q On that eveing [sic], at approximately 11:00 P.M., where were you?
A Walking the streets.
Q Did you have an occasion to come by the address located at 14420 N.W. 21st Court, the home of Essie Daniels?
A Excuse me. What you mean by "occasion"?
Q Did you, that evening, stop by a house located at that address?
A Yes.
Q Did you know the person who lives there?
A Yes.
Q Did you know that person by name?
A No.
Q How did you know that person?
A She was Sarah's grandmother.
Q Had you been to that house previously?
A Yes.
Q For what purpose?
A To eat there.
Q On this night, did you approach the house?
A Yes.
Q Whereabouts did you approach the house at?
A The front door.
Q Did you notice anything in particular about the front door?
A It was open.
Q Were there lights on in the house?
A In the living room.
Q What did you do when you noticed the door was open?
A Went in.
Q What was your purpose in going inside?
A Getting some money.
Q When you were inside the house, did you observe the person who lived there?
A Yes.
Q And where was she?
A Coming out the kitchen.
Q Can you recall what she was wearing?
A No, but on the picture she had a gown.
Q Did she have anything in her hands?
A Yes, a knife.
Q Did she say anything to you or you to her?
A No.
Q What action did she take?
A She cut me.
Q How did she go about cutting you?
A Swinging the knife.
Q Were you aware of how many times you were cut?
A No.
Q As a result of her cutting you, what did you do?
A I took the knife from her.
Q Once you took the knife from her, what did you do with it?
A Started hitting her with it.
Q Were you stabbing her?
A Yes.
Q Whereabouts on her body?
A Anywhere I could.
Q Are you aware of how many times on that night you stabbed her?
A No.
Q Did she fall down?
A Yes.
Q Did you continue stabbing her?
A Yes.
Q What did you do next?
A Emptied her pocketbook on the bed.
Q Where was this bed located in the house?
A In the back.
Q Once you emptied the pocketbook on the bed, what did you do?
A Took the money.
Q Do you know how much money you picked up?
A It was several bills, fives, tens, and ones.
Q And where did you put this money?
A In my pocket.
Q Were you bleeding from the hand that was cut during this time?
A Yes.
Q Are you aware of any of your other actions in that house that night?
A No, because I came back out the front door 
Q Are you aware of whether you actually did have any actions in this house or you just can't remember?
A I can't remember.
Q Do you recall leaving by the front door?
A Yes.
Q And what did you do then?
A Went to the house.
Q When you got to the house, did you come in contact with any other person?
A No.
Q Have you discussed your involvement in this murder with any other person?
A No, I haven't.
Q Did you have an occasion to leave the City of Miami after this murder?
A When I was in the hospital?
Q Did you leave Miami sometime after this murder?
A Yes.
Q And where did you go?
A Jacksonville.
Q What was your purpose in going to Jacksonville?
A I didn't have nowhere to stay down here.
Q Are you aware that you are under arrest for first degree murder, robbery and burglary at this time?
A Yes.
Q Has everything that you have stated been true and correct to the best of your knowledge?
A Yes.
Q Has anyone threatened or coerced you in any way to give this statement?
A No.
Q Have you given this statement freely and voluntarily?
A Yes.
DETECTIVE PARMENTER: Thank you.
[3] We emphasize that the Brown categories of lesser included offenses were substantially modified by a series of decisions approving a schedule of lesser included offenses and amending Florida Rules of Criminal Procedure 3.490 and 3.510 relating to jury instructions, effective October 1, 1981, after the trial in this cause. See In the Matter of the Use by the Trial Courts of the Standard Jury Instructions in Criminal Cases and the Standard Jury Instructions in Misdemeanor Cases, 431 So.2d 594 (Fla. 1981); In the Matter of the Use by the Trial Courts of the Standard Jury Instructions in Criminal Cases, 431 So.2d 599 (Fla. 1981); and In Re Florida Rules of Criminal Procedure, 403 So.2d 979 (Fla. 1981). We note that the necessarily included lesser offenses of first-degree murder are second-degree murder and manslaughter.

Section 919.16, Florida Statutes (1965), was repealed by section 180, chapter 70-339, Laws of Florida. The contents of this statute were adopted in 1967 as Florida Rule of Criminal Procedure 3.510, which was one of the rules amended effective October 1, 1981.