Theodore Christopher HARRIS, Petitioner–Appellant,

v.

Richard DUGGER, Secretary, Department of Corrections, State of Florida, Robert Butterworth, Attorney General, State of Florida, Respondents–Appellees.

No. 88–5612.

United States Court of Appeals, Eleventh Circuit.

May 16, 1989.

---

* Senior U.S. Circuit Judge Elbert P. Tuttle has elected to participate in further proceedings in this matter pursuant to 28 U.S.C.A. § 46(c).

Daniel L. Rabinowitz, McCarter & English, Lance Cassak, Keith E. Lynott, Newark, N.J., for petitioner-appellant.

Charles M. Fahlbusch, Atty. Gen., Dept. of Legal Affairs, Miami, Fla., for respondents-appellees.

Before HILL, VANCE and ANDERSON, Circuit Judges.

HILL, Circuit Judge:

Theodore Christopher Harris, a Florida prisoner convicted of first-degree murder and sentenced to death, appeals the denial of his petition for the writ of habeas corpus. The issues presented are whether the appellant's confession resulted from an illegal arrest and police coercion, in violation of the Fourth and Fourteenth Amendments, and whether Harris' lawyers rendered ineffective assistance of counsel during the penalty phase of his trial, in violation of the Sixth and Fourteenth Amendments.

## I

The victim, Essie Daniels, a seventy-three year old woman, was found dead in her Miami home on the morning of March 22, 1981. An autopsy revealed that she had been stabbed approximately fifty times and had been beaten with a blunt instrument. Police officers found blood spattered over the walls and furnishings of the bedroom, living room and kitchen, indicating that Daniels had attempted to escape the assailant while she was being attacked. A subsequent criminal investigation focused on Theodore Harris as a suspect, and on April 14, 1981, the police arrested the appellant pursuant to a warrant. Harris first denied his involvement in the murder, but after a six hour interrogation, he confessed to having killed the victim.

Harris told the police that he had gone to the victim's home in order to rob her, not to kill her. Upon entering the home, however, Essie Daniels, carrying a kitchen knife in her hand, confronted Harris. A violent struggle ensued, and the victim struck the appellant with the knife first, severely lacerating his hand. Harris then seized the knife, whereupon he repeatedly stabbed the victim. After the attack ended, Harris proceeded to the victim's bedroom, emptied her pocket book, and took approximately $30.

On April 28, 1981, a Dade County, Florida, grand jury indicted Harris for murder in the first degree, as well as for burglary with assault and robbery. Prior to trial, the defense moved to suppress the appellant's confession, and the judge held an evidentiary hearing. At that hearing, Harris argued that the confession had resulted from an unlawful arrest and police coercion. In attacking the arrest, the appellant relied on *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), contending that the investigating police officer had made deliberate misrepresentations of material facts in the affidavit of probable cause used to obtain the arrest warrant.[1] The court rejected this claim, however, finding that *Franks* had not been satisfied since "there was no deliberate falsity or reckless disregard by the investigating police agencies.... Moreover, assuming arguendo, there even was a falsity or disregard, there remains sufficient contents within the warrant affidavit to support a finding of probable cause."

The appellant also challenged the legality of the confession by arguing that it was

---

1. In *Franks,* the Supreme Court held "that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." 438 U.S. at 155–56, 98 S.Ct. at 2676–77.

involuntary. Evidence at the suppression hearing established that at the time of arrest, Harris had a cast on his right forearm which interfered with his wrists being handcuffed behind his back, as police regulations required. So, the police handcuffed Harris' right elbow to his left wrist behind his back. The appellant remained handcuffed while sitting in an aluminum chair throughout the six hour interrogation. Harris testified that during this time the police beat, tortured and threatened him to obtain his confession. However, police officers testifying for the state denied that Harris had been physically or emotionally abused in any way. The officers stated that Harris stayed calm, unemotional throughout the interrogation, that he never complained of discomfort or pain and did not request an attorney although receiving the warnings mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), several times. The state court found the officers' version of the interrogation more credible and concluded that Harris had confessed voluntarily.

Harris neither testified nor did the defense call any witnesses during the guilt-innocence phase of the trial. The jury convicted the appellant of first-degree murder, burglary and robbery. During the penalty phase of the trial, the state presented medical testimony concerning the nature of the victim's injuries and the resulting pain that she had suffered. The state introduced additional evidence that Harris had previously been convicted of robbery and was on parole at the time of the murder. Harris presented no evidence in mitigation or rebuttal. Subsequently, the jury rendered a recommendation of death by a vote of eight to four, and the judge imposed the death penalty.[2] The Supreme Court of Florida affirmed the convictions and the death sentence. *Harris v. State*, 438 So.2d 787 (Fla. 1983), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 563 (1984). The court agreed that Harris had not satisfied *Franks v. Delaware* in proving an unlawful arrest and found that the record supported the trial court's conclusion that the confession was voluntary. *Id.* at 793–94. Thereafter, Harris filed a petition for the writ of habeas corpus in the Supreme Court of Florida alleging ineffective assistance of appellate counsel which the court denied. *Harris v. Wainwright*, 473 So.2d 1246, 1247 (Fla.1985).

The appellant then filed a motion for post-conviction relief in the state trial court pursuant to Florida Rule of Criminal Procedure 3.850. He alleged, *inter alia*, that his two trial lawyers, Alfred Williams and Pedro Echarte, had rendered ineffective assistance of counsel during the penalty phase of his trial by failing to investigate, prepare or present any mitigation evidence. The state court held an evidentiary hearing in June, 1988, at which Williams and Echarte testified. Both lawyers stated that neither one of them had properly investigated Harris' background. Neither lawyer had obtained Harris' school or military records. Neither one had traveled to Jacksonville, Florida, Harris' hometown, to meet the appellant's parents, sister, brother-in-law, niece, friends, employers and neighbors to learn whether they could offer beneficial mitigation evidence. In fact, the lawyers' testimony demonstrated that, prior to the day of sentencing, neither had performed any investigation in advance for the penalty hearing. Their testimony indicates that their failure to investigate occurred because each believed that the other was preparing the penalty phase of the trial:

> Q. Now, Mr. Williams, who was responsible for the preparation of the penalty

---

2. The trial judge found the following aggravating circumstances: (1) Harris was under a sentence of imprisonment when he committed the murder; (2) he had previously been convicted of a felony involving violence; (3) Harris committed the murder while engaged in a robbery or burglary; (4) the murder was especially heinous, atrocious and cruel; and (5) Harris committed murder in a cold, calculated and premeditated manner. The Supreme Court of Florida rejected the last aggravating circumstance as unsupported by the evidence. However, the court held that the improper finding did not require a new sentencing hearing. *Harris v. State*, 438 So.2d 787, 798 (Fla.1983), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 563 (1984).

phase of this case as between yourself and Mr. Echarte?

A. Mr. Echarte.

. . . .

Q. Mr. [Echarte], between you and Mr. Williams, which of you was responsible for the preparation of the penalty phase in this trial?

A. Mr. Williams.

Other testimony indicated that the lawyers employed an investigator to assist them in preparing the Harris case. However, no evidence demonstrated that Williams or Echarte ever received or relied on background information developed by the investigator concerning the penalty phase. Williams testified, for example, that he assumed that Echarte and the investigator were working jointly to develop mitigation evidence. But, Echarte testified to the contrary, stating that he neither assigned the investigator to research Harris' background nor did the work himself.[3]

As a result, the lawyers had no evidence to offer in mitigation at the commencement of the sentencing hearing on Saturday, September 26, 1981. Williams thus requested a continuance, which the court granted until Tuesday, September 29. In that time, the record demonstrates that the attorneys attempted to contact Harris' ex-wife and one of his Miami friends to obtain some mitigation testimony. However, the ex-wife's hospitalization in Jacksonville precluded her from appearing at the penalty hearing and the friend, according to Williams, refused to testify. The record is unclear as to whether the lawyers made any other attempts to contact witnesses. Thus, at the Tuesday hearing, no friends or relatives testified on Harris' behalf, and Williams explained the absence of family members to the sentencing jury in his closing statement by stating that Harris' "family has turned against him because he was accused of this act."

■ However, at the Rule 3.850 hearing in state court, the appellant contended that Williams had mischaracterized the Harris family's feelings about the appellant. Harris presented witnesses, including his sister, brother-in-law, niece, ex-wife and a minister, who stated that they would have gladly testified at the sentencing hearing on Harris' behalf. With the exception of Harris' ex-wife, who had been hospitalized at the time of the hearing, the witnesses blamed their absence on the fact that neither of Harris' lawyers nor the investigator had contacted them in regard to the penal-

---

**3.** Williams gave the following testimony concerning the investigator, Gary Wayne:

Q. Now, during the course of your preparation of the trial phase and the penalty phase, you were receiving reports form either Mr. Echarte or from your investigator, Mr. Wayne, that contacts were being made with family members, correct?

A. Yes.

Q. And that they were developing a background history for your client for the penalty phase?

A. *That's what I assumed was taking place, yes.* (Emphasis added)

Q. That's what they told you was taking place, was it not?

A. Well, the penalty phase was assigned to Pedro [Echarte] and he was to work it up. I got reports in the interim that he had talked to certain people, certain things were coming, certain things were not developing.

Q. They were not developing, but the efforts were being made to develop them by both your investigator and Mr. Echarte?

A. As far as I know, yes.

But Echarte explained that his co-counsel's assumptions were incorrect:

Q. Mr. Echarte, during the course of your representation of Mr. Harris, did you at any time confer with Mr. Harris' family?

A. No.

. . . .

Q. Did you at any time during your representation of Mr. Harris confer with or speak to any of Mr. Harris' former employers or friends?

A. No.

. . . .

Q. Mr. Echarte, did you ever go to Jacksonville to visit the Harris family?

A. No.

Q. Did you ever visit the neighborhood where Mr. Harris grew up?

A. I did not.

Q. *Did you ever assign an investigator to do so on your behalf?*

A. *I did not.* (Emphasis added)

Q. Mr. Echarte, did you ever spend time sitting with Mr. Harris to discuss his background and his personal history in preparation for the penalty phase?

A. I did not.

ty phase. The witnesses also stated that, given the opportunity, they would have described Harris to the sentencing jury as a kind, decent man, a dependable employee, a family man, dedicated to his son, his niece and his ex-wife's other children. All of the witnesses found value in the appellant's life, despite his incarceration and prior criminal conduct. Echarte testified at the Rule 3.850 hearing that he would have presented these witnesses at sentencing had he known about their existence. Williams stated that the failure to seek out this evidence constituted ineffective assistance of counsel.[4]

The state trial court denied Harris' motion for post-conviction relief, finding that counsel had rendered effective assistance, and the Supreme Court of Florida affirmed. *Harris v. State*, 528 So.2d 361 (Fla.1988). Harris subsequently filed a petition for the writ of habeas corpus pursuant to 28 U.S. C. § 2254 in the District Court for the Southern District of Florida. The district court also denied relief, finding that the affidavit of probable cause did not violate *Franks v. Delaware* and that Harris had confessed voluntarily. The district court also concluded that Harris' lawyers had rendered adequate assistance of counsel during the penalty phase. This appeal ensued.

## II

### A. *The Confession*

Appellant contends that the confession was the fruit of an illegal arrest because a police investigator submitted a false and misleading affidavit of probable cause. While not saying so expressly in the brief, Harris raises the *Franks* Fourth Amendment issue once again. However, Harris has fully and fairly litigated this claim in the state courts of Florida. Thus, under the principles of *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), federal habeas review of this claim is precluded. As the Court stated in *Stone*, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S.Ct. at 3052 (footnotes omitted). Accordingly, the district court erred in considering the appellant's *Franks* claim. The Florida courts' conclusions that Harris' arrest comported with the Fourth Amendment resolved this issue. *See also Cardwell v. Taylor*, 461 U.S. 571, 103 S.Ct. 2015, 76 L.Ed.2d 333 (1983) (holding the *Stone* preclusion applicable to confessions challenged on Fourth Amendment grounds); *Williams v. Brown*, 609 F.2d 216 (5th Cir.1980) (*Stone* prevented federal habeas review of a *Franks v. Delaware* claim).[5]

Next, the appellant claims that the police engaged in a coercive, protracted interrogation, vitiating the voluntariness of his confession. Our analysis begins with the well-settled rule that the Due Process Clause of the Fourteenth Amendment prohibits the government's use of involuntary confessions. *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985); *Leon v. Wainwright*, 734 F.2d 770, 772 (11th Cir.1984). A confession is voluntary if, under the totality of the circumstances, it is the product of the defendant's free and rational choice. *Id.* This means that the confession must not be extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence. *Id.* Although the ultimate issue of volun-

---

**4.** Williams' concessions might be construed as reflecting bias. On cross-examination, Williams stated his opposition to the death penalty. He was a public defender, had defended a number of capital cases and Harris was his only client to have reached death row. However, given the state trial judge's endorsement of the lawyer's ability during the Rule 3.850 hearing, we do not, and cannot, second-guess the credibility of Williams' statements. Moreover, because inef-

fectiveness is a question which we must decide, admissions of deficient performance by attorneys are not decisive.

**5.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

tariness is a legal question requiring independent federal determination, state court findings of fact are afforded a presumption of correctness under 28 U.S.C. § 2254(d).[6] *Miller,* 474 U.S. at 112, 106 S.Ct. at 451. As the Court stated in *Miller,* "... subsidiary factual questions, such as ... whether in fact the police engaged in the intimidation tactics alleged by the defendant ... are entitled to the § 2254(d) presumption." *Id.*

■ In rejecting Harris' motion to suppress the confession, the state trial court found that the police had not threatened, beaten, tricked or harmed the appellant in any way and that pictures taken of him shortly after giving the confession confirmed the absence of physical harm. The court also concluded that Harris' demeanor throughout the interrogation remained calm, and that although he received three sets of *Miranda* warnings, he did not request an attorney. Also, the court found that Harris read and made corrections on his written confession, evidencing a desire to confess. Because these factual determinations are fairly supported by the record, we must afford them a presumption of correctness under 28 U.S.C. § 2254(d). *Miller,* 474 U.S. at 112, 106 S.Ct. at 451. Consequently, accepting the state court's findings as fact, we conclude that Harris gave a voluntary and reliable confession.[7]

### B. *Ineffective Assistance of Counsel*

■ The Sixth Amendment guarantees a criminal defendant the right of effective assistance of counsel during a capital sentencing hearing. *Strickland v. Washington,* 466 U.S. 668, 686–87, 104 S.Ct. 2052, 2063–64, 80 L.Ed.2d 674 (1984). Appellant claims that his lawyers' failure to investigate, prepare and present mitigation evi-

dence tending to show his good character denied him this right. Our analysis under *Strickland* has two components: First, Harris must show that his lawyers rendered deficient performance by specifying acts and omissions which allegedly fell outside the wide range of professionally competent assistance. *Id.* at 687–90, 104 S.Ct. at 2064–66. Second, Harris must demonstrate that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064. That is, the appellant must show that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is one sufficient to undermine our confidence in the outcome. *Id.* at 694, 104 S.Ct. at 2068.

The state contends that the appellant has failed to prove either deficient performance or prejudice. It argues that Williams and Echarte relied on their investigator in preparing for the penalty phase, and such reliance, as opposed to interviewing the witnesses themselves, was not an unreasonable performance.[8] As to prejudice, the state contends that the introduction of evidence of appellant's good character through testimony of his relatives and friends would have provided a "springboard" for the prosecutor to inquire into Harris' numerous prior crimes. Those prior crimes include convictions for burglary, assault and battery, a drug offense and a robbery in which the appellant broke an elderly woman's arm by snatching her purse. In addition, Harris' military records disclose that he received an undesirable discharge from the Army. Thus, the state urges that Harris suffered no prejudice from the omission of mitigation evidence since the prosecutor was prevented from

---

**6.** 28 U.S.C. § 2254(d) establishes a presumption of correctness for "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia...."

**7.** We also reject Harris' request for an evidentiary hearing concerning the voluntariness of his confession since he had a full and fair opportunity to present all of his evidence at the state court suppression hearing.

**8.** The state judge presiding over the Rule 3.850 hearing and the district judge found this argument to be persuasive in holding that Harris' lawyers had rendered effective assistance of counsel.

introducing evidence of Harris' unfavorable record.

An attorney is not obligated to present mitigation evidence if, after reasonable investigation, he or she determines that such evidence may do more harm than good. *Smith v. Dugger*, 840 F.2d 787, 795 (11th Cir.1988). Moreover, the attorney is not necessarily required to investigate every evidentiary lead; an attorney's decision to limit his or her investigation may be reasonable under the circumstances. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. However, such decisions must flow from an informed judgment. Here, counsel's failure to present or investigate mitigation evidence resulted not from an informed judgment, but from neglect. Each lawyer testified that he believed that the other was responsible for preparing the penalty phase of this case. Thus, prior to the day of sentencing, neither lawyer had investigated Harris' family, scholastic, military and employment background, leading to their total—and admitted—ignorance about the type of mitigation evidence available to them. Such ignorance precluded Williams and Echarte from making strategic decisions on whether to introduce testimony from Harris' friends and relatives. We conclude, therefore, that the lawyers rendered inadequate assistance of counsel. *See Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir.), *cert. denied*, 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985) ("It should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness.").

In reaching our conclusion, we reject the state's contention that counsel based a strategy on information supplied to them by an investigator. The record simply does not support the state's position. Williams, who admittedly did not investigate Harris' background, *assumed* that Echarte and the investigator were developing background information. However, Echarte's testimony that he neither labored with an investigator nor accomplished the work himself belies the accuracy of Williams' assumption.

Yet, if the failure to investigate did not deprive the appellant of beneficial evidence, there may be inadequate assistance but no prejudice and thus no constitutional deprivation. *Strickland*, 466 U.S. at 691–92, 104 S.Ct. at 2066–67. Here, the prejudice component in *Strickland* requires close scrutiny. It is critical to the reliability of a capital sentencing proceeding that the jury render an individualized decision. *Gregg v. Georgia*, 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976); *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978); *Armstrong v. Dugger*, 833 F.2d 1430, 1433 (11th Cir.1987). Thus, the jury's attention should be focused on the "particularized nature of the crime and the particularized characteristics of the individual defendant." *Gregg*, 428 U.S. at 206, 96 S.Ct. at 2940. In this case, the sentencing jury knew much about the crime, having just convicted Harris of a brutal murder, but little about the characteristics of the defendant. They did not know that family members would contend that Harris was a devoted father, husband and brother. They did not know that these relatives and a minister would describe Harris as a decent, loving man whose life was important to them. To the contrary, appellant's lawyer erroneously told the jury that Harris' family had "turned against him." Thus, the jury did not assess "the information needed to properly focus on the particularized characteristics of this petitioner." *Armstrong*, 833 F.2d at 1433.

Evidence tending to show Harris' good character might well have been beneficial to the defense. Many death penalty cases involve planned murders,[9] but here the evidence fails to show that the appellant set

---

**9.** In *Strickland,* for example, the defendant planned and committed three brutal stabbing murders, torture, kidnapping, severe assaults, attempted murders, attempted extortion and theft. 466 U.S. at 671–72, 104 S.Ct. at 2056–57.

out to kill Essie Daniels when he entered her home. Instead, the appellant appears to have embarked on a weaponless burglary during which he was surprised by the victim who produced the knife and apparently struck the first blow. The murder was brutal, but the absence of murder as a part of the initial design may have rendered the circumstances of this crime somewhat less egregious in the minds of the jurors. Thus, evidence seeking to show appellant's character as being good may have had a greater impact on a jury deciding whether to impose the death penalty for this crime—a burglary gone horribly awry—as opposed to one involving murder as the intended goal from the inception of criminal conduct.

It does appear that injecting Harris' character as an issue during sentencing was fraught with danger. Although the prosecutor told the jury that Harris committed murder while on parole, the introduction of evidence about Harris' character would have allowed the state to further explore the appellant's other felony convictions as well as his dishonorable discharge from the Army. Nevertheless, on this record, we cannot conclude that effective counsel would have made a strategic decision to forego testimony about Harris' good character merely because its use would have permitted the state to add some prior unlawful acts to the proof already in the case. Indeed, one of Harris' lawyers conceded that he would have used the evidence had he known about it.[10] Testimony about the appellant's good character constituted the only means of showing that Harris was perhaps less reprehensible than the facts of the murder indicated. Because we find that a reasonable probability exists that a jury hearing this evidence would have recommended life, Harris suffered prejudice from counsel's errors.

We conclude that Harris' lawyers rendered ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments. The writ of habeas corpus must be granted insofar as the death penalty is concerned, subject to the holding of a new sentencing proceeding within a reasonable period of time to be set by the district court.[11]

### III

For the foregoing reasons, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

---

10. There is no other conclusion available from this record than that Harris' character witnesses would have testified then, at the appellant's trial, as they do now.

11. In light of our holding, we need not reach appellant's contention that his trial lawyer's closing statement during the penalty phase constituted ineffective assistance of counsel. Also, we do not reach appellant's contention that the prosecutor's statements to the jury during sentencing violated the principles of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).