Roy Allen HARICH,
Petitioner-Appellant,

v.

Louie L. WAINWRIGHT, Secretary Florida Department of Corrections,
Respondent-Appellee.

No. 86–3167.

United States Court of Appeals,
Eleventh Circuit.

March 18, 1987.

Jonathan F. Horn, Kaye, Scholer, Fierman, Hays & Handler, New York City, David A. Reiser, Tallahassee, Fla., for petitioner-appellant.

Margene A. Roper, Asst. Atty. Gen., Daytona Beach, Fla., for respondent-appellee.

Before FAY, JOHNSON and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Roy Allen Harich appeals from a final judgment of the district court denying his petition for a writ of habeas corpus. We affirm in part, reverse in part, and remand for an evidentiary hearing.

Harich was charged under Florida law with first degree murder, attempted first degree murder, use of a firearm in the commission of a felony, and two counts of kidnapping. In a bifurcated trial, the jury first found defendant guilty of all charges, and then voted nine-three to advise the trial court to impose the death penalty on the murder charge. The trial court imposed the death penalty for the murder, and sentenced Harich to thirty years for attempted murder, fifteen years for using a firearm, and thirty years for each of the two kidnappings.

On direct appeal, Harich alleged, *inter alia*, that (1) the prosecutor engaged in improper closing arguments during the guilt/innocence and sentencing phases; (2) the trial court improperly allowed previously suppressed evidence to be admitted during the sentencing phase; (3) the trial court erred in its application of the statutory aggravating circumstances; (4) the trial court did not instruct the jury that a tie vote during the sentencing phase would be a recommendation for life imprisonment; and (5) the Florida capital sentencing statute is unconstitutional. The Florida Supreme Court, one judge dissenting, affirmed petitioner's conviction and sentence. *Harich v. State*, 437 So.2d 1082 (Fla.1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984). After an execution date was set, Harich petitioned the Florida Supreme Court for a writ of habeas corpus. In his petition for habeas corpus, Harich alleged that (1) appellate counsel was ineffective; (2) he was sentenced by a "death qualified" jury; and (3) the prosecutor's closing argument was intended to mislead

the jury. His arguments were unanimously rejected without an evidentiary hearing. *Harich v. Wainwright,* 484 So.2d 1237 (Fla.1986). Next, on March 17, 1986, petitioner filed a motion to vacate judgment and sentence in the Circuit Court for Volusia County, Florida pursuant to Fla.R. Crim.P. 3.850 and sought an evidentiary hearing. Harich's only cognizable claims at this stage were two assertions of ineffective assistance of trial counsel: (1) that trial counsel did not prepare an involuntary intoxication defense; and (2) that trial counsel did not call available witnesses during the sentencing phase. On March 18, 1986, the trial court denied the motion and the request for a hearing, and the Florida Supreme Court, two judges dissenting, affirmed. *Harich v. State,* 484 So.2d 1239 (Fla.), *cert. denied,* — U.S. —, 106 S.Ct. 2908, 90 L.Ed.2d 993 (1986).

On March 18, 1986, Harich filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Florida.[1] The district court dismissed the petition that same day, and denied petitioner's request for an evidentiary hearing. The district court also denied petitioner's request for a certificate of probable cause to appeal. Harich took an immediate appeal and this court granted his request for a certificate of probable cause, and entered an order staying his execution pending this appeal.

### FACTS

Roy Harich came home from work at 4:00 p.m. on June 26, 1981. He testified that from that time until 9:00 p.m. that evening he consumed approximately 15 cans of beer and six marijuana cigarettes, and was "mildly drunk." Trial Transcript, Vol. II, at 502–08. He was on his way home from a friend's house when he met Carlene Kelley and Deborah Miller at a gas station in Daytona Beach. The two girls did not know Harich, but after some discussion they accepted a ride with him to the pier where they were to meet another friend. While they were in Harich's van, the three smoked a small amount of marijuana.

As they were riding, Harich suggested that they go to the woods where he was growing marijuana plants so that the party could continue. On the way, they stopped at a convenience store where they purchased a six-pack of beer. When they finally arrived at petitioner's marijuana patch, they discovered that the leaves were too damp to be smoked, so they placed the leaves under the hood of the van to dry. After about an hour of waiting, petitioner began to discuss the sexual problems he had been having with his wife. At this point, Deborah asked if they could leave. They got into the van and departed.

Petitioner drove only a few yards before he stopped the van, pointed a gun at the girls, and ordered them to undress. Petitioner forced Carlene to have sex with him, then became disgusted and told the girls to get dressed. He offered to give them a ride back, promising not to hurt them, and the girls accepted.

Petitioner drove them about a quarter of a mile, but stopped when Carlene asked if she could use the bathroom. He told the two girls that they should get out and walk the rest of the way to the highway but that they should lie down behind the van while he drove away. As they were walking toward the back of the van, Deborah told Carlene to try and see the license plate number. The two then laid down on their stomachs behind the van. But as Deborah looked up at the license plate, Harich was upon them. He was holding a gun, which was wrapped in a towel to muffle the sound of a shot. Carlene begged for their lives, but petitioner shot her in the back of the head. He then shot Deborah in the back of the head. The two were still alive, however, and were crying when the petitioner came back out of the van with a knife. He lifted Deborah's head and cut away at her throat. He then cut Carlene's

1. Also on this date, Harich petitioned the Supreme Court for a stay of execution pending their decision on the petition for certiorari. The Court denied his request, — U.S. —, 106 S.Ct. 1392, 89 L.Ed.2d 707 (1986), thus requiring Harich to file his habeas petition in the district court while his petition for certiorari was still pending.

throat, severing her spinal cord, and causing instantaneous death. Harich then drove away.

Miraculously, Deborah did not lose consciousness. After checking Carlene, she walked and crawled toward the main road, stopping periodically to rest at the side of the road.[2] Finally, she made it to the highway and flagged down a passing motorist who got her to a hospital.[3] At the hospital, Deborah told the police that her attacker's name was Roy, and she described the man and his van. Trial Transcript, Vol. I, at 228. She was the state's key witness at trial, and was able to make an in-court identification of the petitioner.

Harich was the only witness for the defense. He claimed that, due to the amount of alcohol and drugs he consumed the night of the murder, he was unable to recall the events in detail until December, 1981. Harich testified that he read about the murder in the newspaper and heard that the police were looking for a man with a van which closely resembled Harich's van. Fearing that he might be a suspect, he contacted a local defense lawyer. According to Harich, they agreed he would go to the police to explain his innocent role in the incident. The police, however, arrested Harich before he contacted them. Harich testified that when his memory finally became clear he remembered driving Carlene and Deborah into the woods to look for marijuana. He denied, however, sexually assaulting Carlene and denied killing Carlene and attempting to kill Deborah. Instead, he claimed he drove the girls out of the woods, dropped them off at a nearby convenience store at approximately 11:00 p.m., and got home at 11:10 p.m. The incident was reported to the police at 11:59 p.m.

Harich raises several arguments in support of his petition for a writ of habeas corpus:

(1) That his trial counsel's ineffectiveness and the prosecutor's closing arguments during the guilt/innocence phase combined to deprive him of a voluntary intoxication defense. At the very least, Harich argues, he is entitled to an evidentiary hearing on the issue of ineffectiveness.

(2) That he is entitled to an evidentiary hearing to show that trial counsel was ineffective because counsel failed to adequately investigate and present mitigating evidence during the sentencing phase.

(3) That several of the prosecutor's remarks during his closing argument rendered both phases of the trial fundamentally unfair.

(4) That Harich's statements to police, which were suppressed during the guilt/innocence phase were improperly admitted during the sentencing phase.

(5) That the prosecutor and the trial court misled the jurors as to their role in the sentencing procedure, in violation of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

(6) That the statutory aggravating circumstances, as applied in this case, are unconstitutional.

(7) That the trial court erroneously instructed the jurors that a majority of them had to agree in order to make a sentencing recommendation.

## I. THE INTOXICATION DEFENSE

Harich maintained his innocence throughout the guilt/innocence phase of the trial. He also testified that he drank fifteen cans of beer and smoked seven marijuana cigarettes during the five hours preceding his meeting with Carlene and Deborah. Harich's counsel used this information for several purposes during the guilt/innocence phase. First, he asked Harich whether, given his condition, he was sexually attract-

---

**2.** Thinking she was going to die, Deborah attempted to leave some evidence. She testified that she tried to write either the name Roy, or the word van, in the sand with her fingers during one of her rest stops. When shown a photograph of the area at trial, she was unable to positively identify what she had written.

**3.** The emergency room doctor testified it was unbelievable that Deborah had survived as long as she did. Deborah Miller's courage and incomparable will to live are the only encouraging aspects of this tragic case.

ed to either Carlene or Deborah. Harich responded that he was not. Trial Transcript, Vol. II, at 508. Second, he asked Harich whether his intoxication caused his initial inability to recall the details of his night with Carlene and Deborah. Harich responded that he told the police following his arrest that his memory was incomplete. According to Harich's testimony, he was not sure of his innocence until five months later, when the memory of the night's events became clear in his mind. On cross-examination, Harich testified that he did not usually drink heavily. But when he did drink heavily, Harich said it was not unusual for his memory to fail for a period of time, and then return after several days or months. Trial Transcript, Vol. II, at 554.

The prosecutor addressed the intoxication issue twice during the guilt/innocence phase. First, he elicited testimony from Deborah Miller that Harich did not appear to be intoxicated during the time when they were together. During closing argument, the prosecutor contended that Harich's voluntary intoxication was not a defense:

Well, perhaps it might come to your mind, might come up later on, well, there's a lot of drinking. Does that take away the premeditation? There was some, even though, as you recall, Debbie did not say she thought the Defendant was drunk. She said she thought he was sober. He had two beers, only, while she was with him. That they didn't smoke any pot. That they couldn't get it dried out. So that, at least, her characterization, at that time, of the Defendant, was that he was not intoxicated, nor had he been on drugs, from her observation. The Defendant disagrees with that. He's had a lot of beer. And he's had drugs. But regardless of which point of view you might take, you will still find that the acts took such a deliberate intent and over a period of time, and that *the alcohol was consumed voluntarily, not involuntarily, and that makes a difference,* that that the pot, if, in fact, pot got smoked, that was done voluntarily, not involuntarily, so that drunkenness, and there's been no testimony from

any of the State's witnesses concerning that there was any drunkenness or that, but drunkenness in the situation that you have before you, I submit to you, even that would not be a defense to premeditated murder in this particular case. Nor had it been argued. Like I say, I only have one argument.

Trial Transcript, Vol. II, at 677–78 (emphasis added).

Harich's counsel discussed this issue in his rebuttal closing argument. Counsel explained to the jury that he was arguing alternative theories of defense:

I am here to say to you, on behalf of Roy Harich, as his lawyer, that he says he is not guilty of any of these offenses. Okay. And, so, if I argue anything that sounds any different than that, take it as theory, take it as an answer in part to Mr. Smith's argument. But still I feel that is something that should be said, because Mr. Smith commented on the law with respect to premeditated design.

Trial Transcript, Vol. II, at 700–01. He went on to argue that intoxication can preclude a finding of premeditation:

But, suppose a man is so drunk and so stoned out on marijuana that he can't premeditate? What then? Suppose he's not capable of forming rational, logical thoughts, courses of conduct? Then where is the premeditation if he can't premeditate?

So, if you find from the evidence that Roy Harich, in fact, committed the killing, or any other offense, remember and give effect, if you will, to the rules of the law as they may be, as they will be given to you as to whether or not he could really premeditate and plan and design what happened here.

Trial Transcript, Vol. II, at 702.

Harich raises two distinct constitutional arguments relating to the voluntary intoxication defense. First, that counsel's failure to ask for an instruction on the voluntary intoxication defense, and counsel's failure to adequately prepare and present this defense, constituted ineffective assistance of counsel. Harich requests an evi-

dentiary hearing to prove that counsel's actions fell below constitutional standards and that counsel's failure prejudiced his defense. Second, Harich claims that the prosecutor's misstatements regarding the legal validity of the voluntary intoxication defense rendered his trial fundamentally unfair. These two claims will be discussed in turn.

### A. *Ineffective Assistance of Counsel.*

Petitioner requests an evidentiary hearing to show that his trial counsel was unaware that voluntary intoxication is a defense, under Florida law, to premeditated murder. As a result of this alleged ignorance of the law, Harich alleges counsel: (1) failed to seek a jury instruction on voluntary intoxication;[4] (2) failed to object when the prosecutor misstated the Florida law regarding intoxication; and (3) failed to seek an expert opinion on the impact of intoxication on Harich's ability to premeditate. Neither the state courts nor the district court held an evidentiary hearing in this case.

Petitioner is entitled to an evidentiary hearing if his allegations, taken as true, might merit relief. *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963); *Code v. Montgomery,* 725 F.2d 1316, 1321–22 (11th Cir.1984).

The standard for evaluating ineffective assistance of counsel claims is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 90 L.Ed.2d 674 (1984). First, the court must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. Counsel's function is to "make the adversarial testing process work in the particular case." Still, in order to prevent a flood of intrusive post-trial inquiries into attorney effectiveness, there is a strong presumption that counsel provided effective assistance. *Id.* at 689–90, 104 S.Ct. at 2066. Second, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

---

**4.** As the Florida Supreme Court noted in denying Harich's habeas corpus petition, 484 So.2d at 1238 n.*, the pre-April 1981 version of the Florida Standard Jury Instructions in Criminal Cases contained an affirmative defense instruction for intoxication. Instruction 2.11(c) read as follows:

*When a Defense*

Voluntary drunkenness or intoxication (impairment of the mental faculties by the use of narcotics or other drugs) does not excuse nor justify the commission of crime, but intoxication (impairment of the mental faculties by the use of narcotics or other drugs) may exist to such an extent that an individual is incapable of forming an intent to commit a crime, thereby rendering such person incapable of committing a crime of which a specific intent is an essential element. When the evidence tends to establish intoxication (impairment of the mental faculties by the use of narcotics or other drugs) to this degree, the burden is upon the state to establish beyond a reasonable doubt that the defendant did, in fact, have sufficient use of his normal faculties to be able to form and entertain the intent which is an essential element of the crime.

*When Not a Defense*

Drunkenness (impairment of the mental faculties by the use of narcotics or other drugs) which does not go to the extent of making a person incapable of forming the intent, which is an essential element of a crime, does not in any degree reduce the gravity of the offense. Drunkenness (impairment of the mental faculties by the use of narcotics of [sic] other drugs) arising after the formation of the intent which is an essential element of a crime and voluntarily induced for the purpose of nerving the offender to commit a crime already planned does not excuse nor reduce the degree of the crime.

*Partial Intoxication*

Partial intoxication (impairment of the mental faculties by the use of narcotics or other drugs) which merely arouses the passions or reduces the power of conscience neither mitigates nor lessens the degree of guilt if the offender still knew right from wrong, the probable consequences of his act, and was capable of forming a specific intent to commit the crime.

For some reason, this instruction did not survive the 1981 amendments to the standard instructions, although the other affirmative defense instructions (alibi, insanity, entrapment, and self-defense) were carried forward. Notwithstanding the exclusion of the intoxication instruction in the 1981 amendment, intoxication remains a defense to specific intent crimes in Florida. *See Gardner v. State,* 480 So.2d 91 (Fla.1985); *Linehan v. State,* 476 So.2d 1262 (Fla.1985).

When challenging effectiveness during the guilt/innocence phase, the defendant must show that, but for the ineffective assistance, the jury would have had a reasonable doubt as to his guilt.

The state raises several objections to petitioner's request for a hearing. First, that counsel's decision to pursue one defense at the expense of another defense is a tactical decision which should not be questioned by a reviewing court. *See Strickland*, 466 U.S. at 689–90, 104 S.Ct. at 2066; *Corn v. Zant*, 708 F.2d 549, 561 (11th Cir.1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984), *vacated on other grounds*, —— U.S. ——, 106 S.Ct. 3326, 92 L.Ed.2d 732 (1986); *United States v. Driver*, 798 F.2d 248, 254–55 (7th Cir.1986). The state argues that counsel chose to raise the intoxication issue in closing argument, but chose not to stress such a defense given its inconsistency with the primary defense of factual innocence. The district court, without holding an evidentiary hearing, found that counsel's failure to pursue the intoxication defense "was an actual trial tactic used by defense counsel." Record, Tab 12, at 3.

It is reasonable, in some instances, for counsel to ignore certain defenses in order to strengthen others. *See, e.g., Songer v. Wainwright*, 733 F.2d 788, 790–91 (11th Cir.1984) (counsel not ineffective for failure to raise self-defense where such defense would have required proof of defendant's past drug use and where the principal defense was lack of premeditation). Indeed, this is especially true where the defenses are inconsistent. *See Driver*, 798 F.2d at 254–55 ("defense counsel could reasonably have concluded that the strength of [defendant's] claim to innocence would have been dissipated by arguing to the jury that [defendant] was part of a conspiracy to distribute cocaine, but that he was not part of the conspiracy charged in the indictment"). Foregoing a viable defense, however, can be considered "tactical" only if it is an *informed* decision.

Harich's claim that counsel misunderstood the law deserves closer scrutiny than would be available to a petitioner challenging an informed tactical decision. We cannot, however, reach the merits of Harich's claim given the absence of a record on this point. No court has heard testimony from trial counsel regarding his decisions in pursuing Harich's defense. Without such a hearing, this court cannot assume that the failure to actively pursue the intoxication defense was a tactical decision. *See Porter v. Wainwright*, 805 F.2d 930, 935 (11th Cir.1986) (without the benefit of an evidentiary hearing at any level, we could not conclude that attorneys' failure to present mitigating evidence was a tactical decision); *Thomas v. Zant*, 697 F.2d 977, 982 (11th Cir.1983) (state court finding that counsel's conduct was an "apparently tactical decision" is not entitled to deference where "that determination was made in the absence of any direct evidence as to what trial counsel's strategy was and as to whether counsel's decision was reasonable"); *Johnson v. Estelle*, 704 F.2d 232, 239 n. 5, 240 (5th Cir.1983) (whether abandoned defense was meritorious under the facts as known by counsel was a matter of conjecture; "without impugning counsel's integrity or professionalism we must conclude that in the absence of a record the truth of this issue is undeterminable"), *cert. denied*, 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 237 (1984). *See also Code v. Montgomery*, 725 F.2d at 1321 (where lower courts have not found facts necessary to a determination of ineffective assistance claim, court must remand for an evidentiary hearing).

■ Second, the state argues that since Harich testified that he was innocent, he cannot complain that counsel did not pursue a defense inconsistent with that testimony. When a defendant preempts his attorney's strategy by insisting that a particular defense be followed, no claim of ineffectiveness can be made. *Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir.1985); *Foster v. Strickland*, 707 F.2d 1339, 1343, (11th Cir.1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984). This court cannot find that such a preemption of strategy took place in this case without an evidentiary hearing. There is nothing in the record to indicate that counsel con-

sidered pursuing the intoxication defense, and nothing to indicate that Harich disagreed with using intoxication as an alternative theory of defense.

The state's most persuasive argument is that, assuming counsel misunderstood the law, counsel's failure to consider the intoxication defense was not prejudicial in this case because such a defense was not available on the facts. Under Florida law, "the intoxication defense to first degree murder is not available merely when the assailant has engaged in substantial drinking prior to the incident or is even intoxicated but only when the assailant is so intoxicated that he is unable to form an intent to kill." *Wiley v. Wainwright*, 793 F.2d 1190, 1194 (11th Cir.1986) (citing *Leon v. State*, 186 So.2d 93 (Fla. 3d Dist.Ct.App.1966)). *See Linehan v. State*, 476 So.2d 1262, 1264 (Fla.1985) ("evidence of alcohol consumption prior to the commission of a crime does not, by itself, mandate the giving of jury instructions with regard to voluntary intoxication"). The Florida Supreme Court, in denying Harich's request for an evidentiary hearing, found that "trial counsel's conduct was [not] outside the range of professionally competent assistance, given the evidence presented in this case, which included Harich's testimony that he left the victim alive at a convenience store." *Harich v. State*, 484 So.2d 1239, 1241 (Fla.1986).

We note initially that the Florida court's finding that counsel provided effective assistance is not binding on this court. *Kimmelman v. Morrison*, —— U.S. ——, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *Strickland v. Washington*, 466 U.S. at 698, 104 S.Ct. at 2070 (ineffectiveness is a mixed question of law and fact). Next, we note that there is nothing in state or federal law which precludes a defendant from raising alternative theories of defense. The evidence is conflicting as to whether Harich was drunk at the time of the crime. The friend with whom he had been drinking was not called as a witness, nor is there any indication that he was interviewed by counsel. Harich contends that if counsel had understood the law he would have adjusted his defense accordingly. In such a case, we cannot rely solely on the evidence actually presented to determine whether counsel was ineffective for failing to pursue the intoxication defense. For instance, Harich claims that if counsel properly understood the law, expert testimony would have been offered during the guilt/innocence phase to explain the effects of alcohol on his ability to premeditate. Dr. Elizabeth McMahon testified, during the *sentencing* phase, that alcohol and drugs could have caused Harich to commit acts he was otherwise incapable of committing. Further, counsel might have called as a witness Harich's friend who supposedly drank beer and smoked marijuana with Harich on the day of the murder. An evidentiary hearing is required in this case in order to determine whether the record contains all reasonably available evidence in support of an intoxication defense.[5]

We do not have sufficient evidence to hold that counsel was ineffective for his failure to pursue the intoxication defense in this case. Nor do we have sufficient evidence to deny the writ. In cases where a petitioner raises a colorable claim of ineffective assistance, and where there has not been a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing. *See e.g., Code v. Montgomery*, 725 F.2d at 1321–22; *Wiley v. Wainwright*, 709 F.2d 1412 (11th Cir.1983); *Johnson v. Estelle*, 704 F.2d 232

---

**5.** This is the same approach we adopted in *Wiley v. Wainwright*, 709 F.2d 1412 (11th Cir.1983). In *Wiley*, the defendant alleged that his counsel rendered ineffective assistance by failing to properly investigate possible defenses of intoxication and self-defense before advising defendant to plead guilty. We remanded to the district court for an evidentiary hearing because the relevant factual issues were not developed at the state level. On remand, the district court determined that counsel adequately investigated the intoxication defense and that the evidence indicated that the defense was not available because of defendant's admission that he intended to shoot the victim. We affirmed the district court's conclusion that counsel rendered effective assistance with respect to the intoxication defense. *Wiley v. Wainwright*, 793 F.2d 1190, 1194 (11th Cir.1986) (appeal after remand). As in *Wiley*, we cannot adequately assess Harich's claim without further factual development.

(5th Cir.1983); *Thomas v. Zant,* 697 F.2d 977 (11th Cir.1983).[6]

## B. *Prosecutorial Misconduct.*

Harich contends that the prosecutor, during closing argument, misstated the Florida law regarding voluntary intoxication as a defense to first degree murder. It is, of course, improper for the prosecutor to misstate the law to the jury. *See United States v. Berry,* 627 F.2d 193, 200 (9th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981); *United States v. Hammond,* 642 F.2d 248, 249–50 (8th Cir.1981). *Cf. Drake v. Kemp,* 762 F.2d 1449, 1458–59 (11th Cir.1985) (prosecutor's closing argument in which he cited two state supreme court cases which were over 100 years old to urge the jury not to consider mercy in imposing sentencing was misleading and prejudicial), *cert. denied,* —— U.S. ——, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). In order to obtain relief, however, petitioner must show that: (1) the prosecutor in fact misstated the law; and (2) the misstatement rendered the trial fundamentally unfair. *Accord Dobbs v. Kemp,* 790 F.2d 1499, 1504 (11th Cir.1986) (prosecutor's misstatement of law did not render trial fundamentally unfair given the obscurity of the improper implication, the

6. The dissent contends that remanding this case for an evidentiary hearing is contrary to the mandate of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 90 L.Ed.2d 674 (1984). We disagree. First, the dissent stresses the fact that the proposed voluntary intoxication defense was inconsistent with Harich's testimony that he did not commit the crime. Harich also testified, however, that he drank fifteen cans of beer, smoked several marijuana cigarettes, and for several months had no memory of the night of the crime. Given the convincing eyewitness testimony of the surviving victim, we cannot determine, without having the benefit of counsel's testimony, whether counsel as a trial tactic abandoned the intoxication defense in order to strengthen the factual innocence defense. *See Price v. State,* 487 So.2d 34 (Fla. 1st Dist.Ct.App. 1986) (counsel's decision to pursue mistaken identity defense, despite evidence that defendant was intoxicated, and despite convincing evidence that defendant committed the crime, warranted remand for further proceedings on defendant's claim of ineffective assistance of counsel). Furthermore, Harich alleges counsel never made an informed choice between the two defenses because counsel was unaware that voluntary intoxication was a defense to first degree murder. Although we cannot make factual findings on appeal, we note the possibility that counsel was misled by the absence of an instruction on this defense in the Florida Standard Jury Instructions. *See* note 4 *supra.* Since counsel's state of mind is relevant to his performance, this case must be remanded for further factual development on this issue.

Second, the dissent suggests counsel made the best possible use of the intoxication defense by making reference during closing argument to the effect of intoxication on Harich's ability to premeditate. Without an evidentiary hearing, we cannot conclude that this limited use of the intoxication defense was a "trial tactic." *Gardner v. State,* 480 So.2d 91 (Fla.1985), illustrates the importance of counsel's duty, in an appropriate case, to investigate evidence that the de-

fendant was intoxicated at the time of the crime *and* to request a jury instruction if the evidence so warrants. In *Gardner,* the defendant, who stabbed his victim over 50 times, testified that on the day of the crime he consumed three and one-half cans of beer and smoked several marijuana cigarettes. In addition, a state witness testified that the defendant's "eyes looked high" not long after the crimes were committed. The court concluded that this evidence was sufficient to raise a jury question on the issue of voluntary intoxication. Furthermore, the court noted that counsel's ability to make a closing argument regarding the impact of intoxication on defendant's ability to premeditate was not a sufficient substitute for a jury instruction. "The fact that Gardner's counsel could argue his intoxication defense to the jury cannot render the error harmless because the jury must apply the law as given by the court's instructions, rather than counsel's argument." *Id.* at 93. While sheer quantity of consumption is not the only factor, we believe Harich's testimony that he drank fifteen cans of beer, smoked several marijuana cigarettes, and had no memory of the night of the crime, gave rise to a duty on the part of defense counsel to at least *consider* an intoxication defense. The fact that counsel referred to intoxication during his closing argument was not, according to *Gardner,* an effective substitute for a request for a jury instruction. Since we have no evidence that counsel ever considered the voluntary intoxication defense, we cannot accept the district court's unsupported conclusion that counsel's decision to abandon this defense was an "actual trial tactic."

Finally, we do not intimate that defense counsel was ineffective. His decisions may have been dictated by trial tactics. We merely hold that Harich is entitled to an evidentiary hearing on this issue. Under these circumstances, our prior cases clearly mandate that we postpone making a judgment on the merits of the ineffectiveness claim until the relevant facts have been determined.

clear instructions by the trial judge, and the overwhelming evidence of guilt).

■ Harich claims that the prosecutor misstated the law by implying that voluntary intoxication could not be a defense to premeditated murder. The state responds that the prosecutor merely argued that the evidence in this case did not establish the intoxication defense. The prosecutor's statement, quoted *supra* at 1087, was misleading to the extent he stated that voluntary intoxication could not be a defense to premeditated murder. Voluntary intoxication is a valid defense under Florida law. *See Gardner v. State,* 480 So.2d 91, 92 (Fla.1985). As in *Dobbs, supra,* the prosecutor's improper reference was not prejudicial in the context of this trial. The clear focus of the prosecutor's remarks was that the evidence *in this case* did not indicate that the intoxication defense was available. He stressed Deborah Miller's testimony that Harich did not appear to be drunk, and the fact that the defense had not argued intoxication as a defense. The reference to voluntariness, although improper, was only a small part of the prosecutor's intoxication discussion. Moreover, the intoxication discussion was only a small part of the closing argument.

The prosecutor's misstatement did not render the trial fundamentally unfair. *See Darden v. Wainwright,* —— U.S. ——, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986). If any unfairness resulted from forfeiture of the intoxication defense, that unfairness was caused by the alleged ineffectiveness of Harich's counsel, and not by the prosecutor's statement. The Florida courts were correct in holding that the evidence presented to the jury did not support an intoxication defense. Under these circumstances, the prosecutor was permitted to point out that Harich's intoxication was irrelevant to the jury's decision. Since the

intoxication defense had not been argued by the defense, and since the evidence before the jury did not support such a defense,[7] the prosecutor's comments on this subject were not so egregious as to violate petitioner's constitutional rights.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

### (MITIGATING CIRCUMSTANCES)

■ Petitioner requests an evidentiary hearing to show that his trial counsel rendered ineffective assistance in that counsel failed to investigate and present substantial evidence of mitigating circumstances.

During the sentencing phase, Harich's counsel called two jail guards, two former employers, and Dr. McMahon. The guards testified that Harich was well behaved. The former employers testified generally as to Harich's good character and good work habits. Dr. McMahon's testimony centered on Harich's mental capacity and the fact that this act was an aberration which was unlikely to be repeated. In his closing argument, counsel argued forcefully in favor of sparing Harich's life. He noted Harich's devotion to his work and his family. Trial Transcript, Vol. III, at 898.

Harich claims that, without much effort, counsel could have done much more. He asserts there were "scores of family members, friends, and others in the community ready, willing and, indeed, eager to testify for Roy Harich." Appellant's Brief at 23. In his request for an evidentiary hearing, Harich relies primarily on *Thomas v. Zant,* 697 F.2d 977 (11th Cir.1983). In *Thomas,* counsel failed to present any evidence during the sentencing phase of the trial. Although counsel did not testify at the state evidentiary hearing, the district court nevertheless found that counsel's failure to present evidence was "an apparent tactical

---

**7.** Analysis of the record in this context is different than the analysis under ineffective assistance of counsel. Harich's ineffective assistance claim suggests that the record was insufficient to show an intoxication defense *because* of counsel's ignorance of the law. Thus, we considered the possibility that the record would have been different if petitioner's allegations are true. *Ante* at 1090–91. The prosecutor's effect on the trial, on the other hand, must be assessed in light of the evidence actually before the jury. Since the intoxication defense was not established by the evidence, any unfairness in the trial could not have been caused by the prosecutor's misstatement.

decision." In his federal petition, Thomas offered counsel's affidavit in which she "came very close to admitting that she had no strategy at all for the penalty stage of Thomas' capital trial." *Id.* at 988. This court remanded to the district court for an evidentiary hearing on the ineffective assistance claim. The state court's finding that counsel made an "apparently tactical decision" was not entitled to deference because the finding was made "in the absence of any direct evidence as to what trial counsel's strategy actually was and as to whether counsel's decision was reasonable." *Id.* at 987.

This case is distinguishable from *Thomas* because counsel's failure to produce additional witnesses did not prejudice Harich's case. In *Thomas,* petitioner's counsel did not present *any* mitigating evidence. In the present case, counsel presented several witnesses and delivered a strong closing argument. The Florida Supreme Court, after reviewing the proffered mitigating evidence, concluded that "there is no reasonable probability that the result of this trial would have been different had the evidence been presented." *Harich v. State,* 484 So.2d at 1241. Counsel offered evidence showing that Harich was a good worker and a model prisoner. Dr. McMahon testified that the attack was an isolated "explosion" and that such an outburst was unlikely to happen again. Finally, counsel's closing argument was passionate and convincing. Counsel forcefully contested each of the proposed aggravating circumstances and defended each of the proposed mitigating circumstances. He pointed out that Harich was a young, first offender who was operating under extreme emotional disturbance at the time of the murder.

We agree with the district court and with the Florida Supreme Court that the failure to present additional mitigating evidence, even if the result of counsel's neglect, does not undermine our confidence in the outcome of the sentencing proceeding. *See Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069 ("when a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death"). Counsel, in his closing argument, described Harich's personal life, reviewed the aggravating and mitigating circumstances, and argued eloquently for leniency.[8] Thus, since Harich has made an insufficient showing of prejudice, there is no need to remand for an evidentiary hearing with respect to this issue.

## III. PROSECUTORIAL MISCONDUCT

### A. *Guilt/Innocence Phase.*

Petitioner contends that two comments made during the prosecutor's closing argument in the guilt/innocence phase were constitutionally improper. First, the prosecutor attempted to impeach Harich's credibility with his constitutionality protected silence. Petitioner does not direct the court to any specific comment made by the

---

8. The quality of the closing argument distinguishes this case from *King v. Strickland,* 714 F.2d 1481 (11th Cir.1983), *vacated and remanded for reconsideration,* 467 U.S. 1211, 104 S.Ct. 2651, 81 L.Ed.2d 358 (1984), *adhered to on remand,* 748 F.2d 1462 (11th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985). In *King,* counsel called a former employer and a prison guard, but neglected to call two long-term acquaintances of the defendant. In addition, counsel's closing argument "may have done more harm than good." 714 F.2d at 1491. This combination of errors resulted in a finding of ineffective assistance. *Id.* On remand from the Supreme Court, this court adhered to our earlier opinion, noting that the case against King was based on circumstantial evidence. Such cases were said to be more likely candidates for penalty leniency, and thus a finding of prejudice is also more likely. 748 F.2d at 1464. The case against Harich was, of course, based on the eyewitness testimony of Deborah Miller and thus this case was not a likely candidate for leniency.

This case is also distinguishable from *Porter v. Wainwright,* 805 F.2d 930 (11th Cir.1986), in which the trial court declined to follow the jury's recommendation of life imprisonment. Prejudice is more easily shown in jury override cases because of the deference shown to the jury recommendation.

prosecutor, but the only comment which arguably refers to defendant's silence is the following: "The State's witnesses are known. One thing is not known and that was as Defendant told you. The first time that he told the story, the first time he has come forward to tell the entire situation, was yesterday." Trial Transcript, Vol. II, at 670.

■■■ The prosecutor may not impeach a defendant with his post-arrest silence. *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). A prosecutor's statement is objectionable if either: "(1) the manifest intention of the prosecution was to draw attention to the defendant's post-arrest silence; or (2) the jury could infer 'naturally and necessarily' that it was a comment on the defendant's silence." *United States v. Diezel,* 608 F.2d 204, 208 (5th Cir.1979). The prosecutor's statement in this case did not draw attention to petitioner's post-arrest silence. Petitioner himself testified that he did not come forward with his version immediately after his arrest because of memory loss. Even if, as the Florida Supreme Court noted, the comment "border[ed] on the improper," it was not prejudicial. *Harich v. State,* 437 So.2d 1082 (Fla.1983). We agree with the Florida Supreme Court, and thus we reject petitioner's constitutional claim.

■■■ Next, petitioner complains that the prosecutor improperly argued that defense lawyers, as a class, are not to be trusted because they abuse discovery practices and learn to win cases by confusing juries. At the beginning of his argument, the prosecutor told the jury about some advice given to him by a defense lawyer:

He said, if you are ever involved in a first degree murder case, defending a person, always put the blame on some-

one else. Try to choose someone else, even if it is an unknown person, mysterious person. If you can't do that too well, then just try to muddle up the waters and get everyone hidden in the forest among the trees instead of keying in on the issues.... At that time in my career I was a defense lawyer. Since then I have changed sides. But I always found that his words were very wise and very accurate.

Trial Transcript, Vol. II, at 660.

Harich's due process claim is governed by *Darden v. Wainwright,* —— U.S. ——, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). In *Darden,* although the prosecutor's closing argument was clearly improper, there was no due process violation because the comments did not deprive defendant of a fair trial.[9] The prosecutor's comments in the present case were not nearly as inflammatory as the prosecutor's comments in *Darden.*[10] Harich's contention that the prosecutor's remarks about defense counsel rendered his trial fundamentally unfair at the guilt/innocence stage is meritless.

**B.** *Sentencing Phase.*

Petitioner contends that several of the prosecutor's closing remarks during the penalty phase were improper.[11] First, that the prosecutor stressed his own expertise as to the suitability of the death penalty in this case. The prosecutor prefaced his closing argument by noting that:

In fact, in the thirteen years which I have been in this position, in over a hundred thirty-nine, forty cases of this magnitude that I have been associated with, it's only been on four, and now five occasions which have come to the conclusion that this stage of the proceeding is one in which the State must come before you

---

**9.** The Court made it clear that *Darden* was not a "harmless error" case. Before applying "harmless error," the Court assumes there has been a constitutional violation. In *Darden,* because the trial was not fundamentally unfair, there was no constitutional violation. *Darden,* —— U.S. at —— n. 15, 106 S.Ct. at 2473 n. 15.

**10.** For example, in *Darden,* the prosecutor warned that the defendant shouldn't be out of his cell "unless he has a leash on him and a

prison guard at the other end of that leash." 106 S.Ct. at 2471 n. 12.

**11.** The state's argument that these claims are barred by procedural default is without merit. The Florida Supreme Court addressed petitioner's prosecutorial misconduct claims on direct appeal and rejected those claims on the merits. *See Harich v. State,* 437 So.2d at 1086.

and to argue the aggravating circumstances the State feels is necessary in this particular situation.

Trial Transcript, Vol. III, at 856. Later in his argument, the prosecutor added that:

This crime is the most heinous, atrocious and evil and cruel crime that I have known. And believe me, these days, murder becomes something which really is something that doesn't bother us any more. Doesn't bother me. But not this. Not this one.

*Id.* at 886.

We have held this type of argument to be improper. *See Brooks v. Kemp,* 762 F.2d 1383, 1410 (11th Cir.1985) (en banc), *vacated and remanded on other grounds,* —— U.S. ——, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986). The argument "implied to the jury that the prosecutor's office had already made the careful judgment that this case, above most other murder cases, warranted the death penalty." *Id.* In addition, since the "prosecutorial expertise" argument can tend to mislead the jury as to its proper role in the sentencing process, such argument implicates some of the policies discussed in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985) ("it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere").

Although the prosecutor's remarks were improper, resentencing is not required unless the remarks rendered the sentencing proceeding unfair. Our inquiry is "whether there is a reasonable probability that, but for those arguments, the death verdict would not have been given." *Brooks,* 762 F.2d at 1413.

 We find that the prosecutor's remarks did not so infect the sentencing proceeding as to undermine our confidence in the outcome. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2068 (1984).[12] As in *Brooks,* the prejudicial ef-

fect of the prosecutor's improper remarks was mitigated by several factors. First, the remainder of the prosecutor's closing argument clearly demonstrated to the jurors that their proper role was to independently weigh the evidence supporting the various mitigating and aggravating factors. He admonished the jurors to ignore their personal feelings toward the defendant in order to be fair and impartial. Second, Harich's closing argument and the court's instructions stressed to the jury that their decision was to be made on the basis of the evidence presented and not on the basis of either counsel's arguments. We do not say that curative instructions will always remove the prejudice of an improper closing argument. Instead, we find that the improper argument was an isolated mistake in an otherwise fair argument, which was followed by an excellent closing argument by petitioner's counsel, and by proper instructions from the court. On these facts, and given the graphic eyewitness evidence regarding the nature of the murder, the prosecutor's reference to his own expertise in the death penalty area does not undermine our confidence in the outcome.

 Second, petitioner argues that the prosecutor made improper reference to petitioner's exercise of his constitutional right to seek counsel. The day after the murder, Harich, fearing that he might be a suspect, contacted a lawyer. In arguing that appellant committed the crime in order to avoid lawful arrest, which is a statutory aggravating circumstance, the prosecutor stated:

[W]e know that he was attempting to go undetected.

Even when it showed up in the papers, his first reaction was not to call the police and assist them in their investigation. His first reaction was to call a lawyer. And it was to turn himself in for arrest for suspicion of murder, not to give vital information. We know his intent was not to be apprehended and, therefore, another aggravating circum-

---

**12.** In *Brooks,* we held that the Supreme Court's analysis of "fundamental fairness" in the context of counsel ineffectiveness, announced in *Strickland,* was applicable in the context of improper prosecutorial argument. *See Brooks,* 762 F.2d at 1401–02.

stance, because the murder was committed with the intention of ... avoiding detection or from escaping of any possible custodial situation.

Trial Transcript, Vol. III, at 871–73. Petitioner asserts that this allegedly improper argument was "virtually the only evidence" presented on this aggravating factor and as such, the sentence cannot stand. The state does not specifically address this issue, but contends broadly that none of the prosecutor's remarks prejudiced the appellant.

In *United States v. McDonald*, 620 F.2d 559 (5th Cir.1980),[13] our predecessor court held that a prosecutor's reference to the fact that defendant sought counsel prior to the execution of a search warrant was improper. The prosecutor in *McDonald* was attempting to convince the jury to draw an inference that the defendant and his attorney destroyed evidence prior to the search. The former Fifth Circuit held that "[c]omments that penalize a defendant for the exercise of his right to counsel *and that also strike at the core of his defense* cannot be considered harmless error." *Id.* at 564 (emphasis added).

Several facts distinguish *McDonald* from this case. First, *McDonald* was a direct appeal from a federal conviction whereas this case is a collateral attack on a state conviction. Our review of prosecutorial argument in state habeas corpus cases is more limited than our direct review of misconduct by federal prosecutors. *See Dar-* *den,* 106 S.Ct. at 2472 (appropriate standard of review for prosecutorial misconduct claim on habeas corpus is "the narrow one of the due process, and not the broad exercise of supervisory power") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)); *Brooks*, 762 F.2d at 1399. Our review of this case is to determine whether the prosecutor's comment rendered the sentencing proceeding fundamentally unfair. Second, the jury was well aware that Harich sought counsel as soon as he feared he might be a suspect. Harich's own testimony established the facts mentioned by the prosecutor during his closing argument.[14] The fact that the jury was already aware that Harich sought counsel before his arrest distinguishes this case from *McDonald*, where the prosecutor's comments were the jury's only source of information on this issue. A similar distinction was found to be significant in *United States v. Mack*, 643 F.2d 1119, 1124 (5th Cir. Unit A Apr. 1981). In *Mack*, the fact that the jury was aware that defendant was represented by several lawyers rendered the prosecutor's reference to that fact harmless error.[15] *Id.* Similarly, although the prosecutor's remark in this case was unwarranted, its effect on the sentencing proceeding was not so profound as to undermine our confidence in the outcome. Contrary to petitioner's argument, the challenged remark was not the only evidence offered to prove that petitioner committed this crime to avoid lawful arrest. As is discussed below, this

---

**13.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. Nov.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

**14.** During Harich's direct testimony in the guilt/innocence phase, the following colloquy took place:

Q [Defense Counsel] What, if upon reading the newspaper concerning the account of that crime, what, if anything, did you do to seek advice and counsel concerning what you should do in the premises [sic]?

A [Harich] Once I read the newspaper account, which had the description of the van which very closely resembled mine, my wife contacted my father-in-law. He came over to the house. And she told him, asked him if he saw the newspaper that morning.

He said no, he hadn't.

She showed it to him, And she said that there was a possibility that Roy may be involved in something like this.

And he got in touch with an attorney friend of his. I don't remember what his name is. And he gave me the number of Dan Warren. Trial Transcript, Vol. II, at 515.

**15.** Of course, the fact that the jury was aware of Harich's decision to seek counsel does not excuse the prosecutor's decision to argue that the exercise of this right established an aggravating circumstance. As we said in *Mack*, "the prosecutor's remarks fall somewhat short of the high level of evenhandedness expected of those responsible for prosecutions in United States courts." 643 F.2d at 1124.

aggravating circumstance is supported by the facts of the crime, as reported by the surviving victim. The murder took place shortly after petitioner had sexually assaulted his victim. The trial court relied on these facts, and not the fact that Harich sought counsel prior to his arrest, in support of the "avoid lawful arrest" aggravating circumstance. The prosecutor's comment regarding petitioner's pre-arrest activities did not affect the fairness of the sentencing proceeding.

■ Finally, appellant claims that the prosecutor misled the jury as to the mitigating circumstances of "substantial impairment," and age of the defendant.[16] The challenged statement is the following:

Another mitigating circumstance ... is whether or not the Defendant could appreciate the criminality of his conduct and conform the conduct to the requirements of law was substantially impaired. I remind you on that particular point that the doctor stated that in her opinion the Defendant was sane. That not only was he sane but at the time, I actually read a quote to her which she agreed with, from her report, was that it was her opinion that he was not suffering from any disease or defect of the mind such that he was unable to know and appreciate the nature and quality or consequences of his behavior and know that it was wrong. So that Dr. McMahon, without a doubt, has testified he knew the difference at the time of the crime, of right and wrong, and he could understand the nature and consequences of his act. So that the mitigating circumstance, I would submit to you, is not applicable. However, it exists before you to consider.

The age of the Defendant. I think the testimony, at least the appearance, would

show that the Defendant is probably twenty-three years old, maybe twenty-two, at the time of this occurrence. That, we would show, is not really a mitigating circumstance since our common knowledge and our experience shows us most crimes are committed by people in the eighteen to twenty-five year range.

Trial Transcript, Vol. III, at 862–63.

Petitioner's claim regarding this statement is meritless. The prosecutor's comment regarding Dr. McMahon's testimony is supported by the record and does not confuse the distinction between legal insanity and substantial impairment. His comment regarding the defendant's age, while stretching somewhat outside the record, was merely an attempt to rebut any claim that a 22 year old defendant is especially entitled to mercy. *See, e.g., Mason v. State,* 438 So.2d 374 (Fla.1983) (trial judge did not abuse discretion in refusing to find that defendant's age—20 years—was a mitigating circumstance), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984). The prosecutor's comment did not render the sentencing proceeding fundamentally unfair.

## IV. ADMISSION OF STATEMENTS DURING SENTENCING PHASE

During the guilt/innocence phase, the trial judge excluded several statements made by Harich to Volusia County Sheriff's Investigators Vail and Burnsed. These statements were excluded because they were obtained in violation of Harich's Fifth and Sixth Amendment rights. The trial judge did, however, allow the prosecutor to introduce these statements during the sentencing phase of the trial. Investigator Vail testified that Harich said he remembered

---

**16.** Florida recognizes the following statutory mitigating circumstances: (1) the defendant has no significant history of prior criminal activity; (2) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; (3) the victim was a participant in the defendant's conduct or consented to the act; (4) the defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor; (5) the defendant acted under extreme duress or under the potential domination of another person; (6) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (7) the age of the defendant at the time of the crime. Fla.Stat.Ann. § 921.141(6). The jury is not limited to the statutorily enumerated mitigating circumstances and may consider any evidence in mitigation it deems relevant. *Hall v. Wainwright,* 733 F.2d 766 (11th Cir.1984).

leaving Deborah Miller and Carlene Kelley lying behind the van as he drove away from the scene. Trial Transcript, Vol. II, at 758. Investigator Burnsed testified that when Harich was questioned regarding the whereabouts of his weapon, Harich stated that he "must have thrown it out of the window of the van into the drainage ditch next to the dirt road." *Id.* at 761.

On direct appeal, the Florida Supreme Court held, and the state does not deny, that the trial court's admission of unconstitutionally obtained evidence during the sentencing phase was error. *Harich v. State,* 437 So.2d 1082, 1085–86. That court did not reverse Harich's conviction, however, because it found that the error was harmless beyond a reasonable doubt. The district court apparently agreed with this conclusion, noting that "nothing that [Vail and Burnsed] said shed anything new for the trial judge to consider that was not already brought out at trial...." Record, Vol. I, Tab 12 at 5.

■■■■ We agree with the analyses of the courts below. Sergeant Wall testified during the guilt/innocence phase as to Harich's statement that he remembered driving away and seeing the girls' bodies lying behind the van. Therefore, Investigator Vail's testimony was merely cumulative. Burnsed's testimony, on the other hand, was the first mention of Harich's disposal of the murder weapon. Under the circumstances, we do not think that the admission of this testimony affected the sentencing decision. The jury knew that the murder weapon had not been found. Given their finding that Harich committed this murder, it would not have come as a surprise that

Harich also disposed of the murder weapon.

We are not persuaded by Harich's argument that the investigators' testimony showed the sentencing jury that Harich had lied to them during the guilt/innocence phase and that he therefore deserved to die because he was of bad moral character. First, it is clear that the jury disbelieved all of Harich's trial testimony about his role in the murder. That Harich withheld the further fact that he disposed of the gun could have had only a minimal effect on the jury's opinion as to his trustworthiness, even if the jury improperly considered this as a non-statutory aggravating factor. Second, given the graphic eyewitness testimony as to the execution style killing in this case, we find it extremely unlikely that the death sentence was imposed in this case because the judge and jury believed Harich was a liar. The admission of the Vail and Burnsed testimony during the sentencing phase was harmless beyond a reasonable doubt.

## V. MISLEADING THE JURY AS TO ITS PROPER ROLE IN THE SENTENCING PROCESS

Petitioner contends that one statement by the prosecutor and several statements by the trial court misled the advisory jury as to its critical role in the sentencing process, in violation of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).[17] Specifically, the prosecutor told the jury during voir dire that its sentencing decision was a recommendation and that the "court pronounces whatever sentence it sees fit." Trial Transcript, Vol. I, at 74–75.[18] The trial court made several

---

**17.** The state has argued that this claim is barred by the procedural default rule of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). *Caldwell* was decided after petitioner's direct appeal was dismissed, and before petitioner instituted his post-conviction proceeding. Petitioner's attempt to raise this issue in his state collateral attack was rejected because of his failure to raise it on direct appeal. Under similar facts, we have held that there was cause for failure to raise the *Caldwell* claim on direct appeal and that the state court's failure to entertain this claim in a post-conviction proceeding does not constitute an independent and ade-

quate state procedural ground. *Adams v. Wainwright,* 804 F.2d 1526, 1531 n. 6 (11th Cir.1986). As is evident from *Adams, id.* at n. 7, a petitioner satisfies the prejudice prong of *Sykes* when he presents a meritorious *Caldwell* claim. Accordingly, since there was cause for the failure to raise the *Caldwell* claim, we will proceed to a discussion of the merits of this claim in lieu of deciding the merits under the guise of a *Sykes* prejudice inquiry.

**18.** The prosecutor explained the bifurcation of proceedings in capital cases and then told the jury that, in the sentencing phase:

similar statements during the guilt/innocence phase. Before the trial began, the court told the jury that it is the jury's duty to determine guilt or innocence, but that "it is the judge's job to determine what a proper sentence would be if the defendant is guilty." *Id.* at 178. In its instructions to the jury at the end of the guilt phase, the court repeated the above statement, Trial Transcript, Vol. II, at 732, and also noted:

> I will now inform you of the maximum and minimum possible sentences in this case. The penalty is for the court to decide. You are not responsible for the penalty in any way because of your verdict. . . .

*Id.* at 735–36.

The trial court returned to this theme in the sentencing phase. Before the state began its case, the court told the jurors the following:

> As I advised you, when the charge of the law was given you at the conclusion of the case, the punishment of this crime is either death or life imprisonment without possibility of parole for twenty-five years. The final decision as to what punishment shall be imposed rests *solely* upon the judge of this court. However, the law requires that you, the jury, render to the court an advisory sentence as to what punishment should be imposed upon the defendant.

*Id.* at 754–55 (emphasis added). The court then told the jurors that their decision should be based on their balancing of the mitigating and aggravating circumstances in the case. After the evidence was presented, the court instructed the jury, in pertinent part, as follows:

> Ladies and gentlemen of the jury, it is now your duty to advise the Court as to what punishment should be imposed upon the Defendant for his crime of first-

degree murder. As you have been told, the final decision as to what punishment shall be imposed is the responsibility of the Judge; however, it is your duty to follow the law which will now be given to you by the Court and render to the Court an advisory sentence, based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.

> Your advisory sentence should be based upon the evidence which you have heard while trying the guilt or innocence of the Defendant and the evidence which has been presented to you in these proceedings.

Trial Transcript, Vol. III, at 914.

We must decide whether these statements created the "intolerable danger" that the "advisory" jury chose to minimize the importance of its role, thus rendering unreliable the jury's recommendation of the death sentence. *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 2642, 86 L.Ed.2d 231 (1985); *Adams v. Wainwright,* 804 F.2d 1526 (11th Cir.1986). Our inquiry is whether the role of the jury was minimized by these comments to the point that the jurors were likely to have shirked their responsibility in deciding that Harich deserved the death penalty. We do not believe that the challenged comments misled the jury as to the importance of its advisory role.

In *Caldwell,* the prosecutor told the jurors that their sentencing decision was automatically reviewable by the Mississippi Supreme Court, thus shifting the sense of responsibility from the jury to the appellate courts. The court reversed the conviction because "it is constitutionally impermissible to rest a death sentence on a determina-

---

[Y]ours is a recommendation to the Court. The Court pronounces whatever sentence it sees fit. But yours is a recommendation, giving some direction to the Court as to what the circumstances show.

Trial Transcript, Vol. I, at 74–75. Immediately prior to this statement, the prosecutor warned the jury that the sentencing phase "is a very

serious part of the trial and a very serious proceeding." *Id.* at 74. Immediately after this statement, the prosecutor noted that the sentencing phase is not "a proceeding based upon sympathy or based upon any emotion, it is proceeding based upon law, law and facts." *Id.* at 75.

tion made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 105 S.Ct. at 2639.

*Caldwell* involved a situation where the jury was misled as to its role as a sentencer. In *Adams,* we held that *Caldwell* mandates the reversal of a conviction where an *advisory* jury is misled as to the importance of its role.[19] "[T]he jury's role in the Florida sentencing process is so crucial that dilution of its sense of responsibility for its recommended sentence constitutes a violation of *Caldwell.*" *Adams,* 804 F.2d at 1530. It is vital that the advisory jury fully understand the gravity of its sentencing decision because the trial judge is not free to simply disregard the jury's recommendation. As we noted in *Adams:*

> Although the trial judge must ... independently weigh the aggravating and mitigating circumstances and render sentence, the jury's recommendation, which represents the judgment of the community as to whether the death sentence is appropriate in a given case, is entitled to great weight, *McCampbell v. State,* 421 So.2d 1072, 1075 (Fla.1982) (per curiam), and may be rejected by the trial judge only if the facts are "so clear and convincing that virtually no reasonable person could differ." *Tedder v. State,* 322 So.2d 908, 910 (Fla.1975) (per curiam). This limitation on the judge's exercise of the jury override provides a "crucial protection" for the defendant. *Dobbert v. Florida,* 432 U.S. 282, 295, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977).

*Id.* at 1529, *See also Porter v. Wainwright,* 805 F.2d 930, 936 (11th Cir.1986) (under Florida law, "in order for a judge to reject a jury's recommendation of life imprisonment, the facts justifying a death sentence must be so clear and convincing that virtually no reasonable person could differ as to the appropriateness of the death penalty").

The trial court in *Adams* clearly led the jury to believe that the moral responsibility for imposing the death sentence rested solely upon the trial court. The trial judge instructed the jury that he could disregard the jury's recommendation, even if the jury recommended life imprisonment. This clearly misstated the Florida law, which allows for an override of the jury's life recommendation only upon a clear and convincing showing that it was erroneous. *See Tedder v. State,* 322 So.2d 908, 910 (Fla.1975). Furthermore, the trial court told the jury that:

> "[T]his conscience part of it as to whether or not you're going to put the man to death or not, that is not your decision to make. That's only my decision to make and it has to be on my conscience. It cannot be on yours."

*Adams,* 804 F.2d at 1528. Such attempts to shield the jury from the full weight of its advisory responsibility are forbidden by *Caldwell.*

 The prosecutorial and judicial comments in this case did not minimize the role of the jury. The statements went no further than explaining to the jury the respective functions of the judge and jury. The jury was told to listen to the evidence, weigh the aggravating and mitigating cir-

---

**19.** Florida's death penalty statute provides for bifurcated proceedings in capital cases. First, the jury must determine whether the defendant is guilty of a capital crime. Second, if the defendant is found guilty, the court conducts a separate sentencing proceeding to determine whether the appropriate penalty is death or life imprisonment. Fla.Stat. § 921.141(1). The sentencing phase consists of three subphases. First, the jury considers the mitigating and aggravating evidence and renders an advisory sentence to the court. Fla.Stat. § 921.141(2). Second, the trial court decides whether to accept the jury's recommended sentence. If the court decides to impose the death sentence, it must set forth in writing its findings upon which the

sentence of death is based. Fla.Stat. § 921.-141(3). Finally, the judgment of conviction and sentence of death is subject to automatic review in the Supreme Court of Florida. Fla.Stat. § 921.141(4).

The division of authority between the jury and the trial judge under the Florida death penalty statute has been upheld against constitutional challenge. *See Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). In *Spaziano,* the Court made reference to the fact that the jury's recommendation is entitled to some deference by the trial court. 104 S.Ct. at 3165–66.

cumstances, and render an advisory opinion as to the applicability of the death penalty in this case. Nothing was said which would imply to the jury that its recommendation was superfluous or that the importance of the jury's decision was lessened by the fact that it was only a recommendation. Upon examination of the record, we conclude that the seriousness of the jury's advisory role was adequately communicated by the court and prosecutor. We agree with the Florida Supreme Court that comments which accurately explain the respective functions of the judge and jury are permissible under *Caldwell* "as long as the significance of [the jury's] recommendation is adequately stressed." *Pope v. Wainwright*, 496 So.2d 798 (Fla.1986). While the trial court did not, as we would prefer, explain that the jury's recommendation is entitled to great deference, we cannot say that this jury felt anything but the full weight of its advisory responsibility. As a result, petitioner's *Caldwell* claim must fail.

## VI. AGGRAVATING AND MITIGATING CIRCUMSTANCES

### A. *Mitigating Circumstances.*

 Petitioner contends that the trial court ignored unrebutted mitigating evidence in making its decision to accept the jury's recommendation of the death sentence. In its findings of fact in support of the death penalty, the trial court recounted the four aggravating circumstances [20] and five mitigating circumstances [21] that were before the sentencing jury. The court then noted that the jury rejected the proposed mitigating circumstances, although the court did find that Harich had no significant history of prior criminal activity. Because the court found the aggravating cir-

cumstances outweighed the one mitigating circumstance, it found that the death penalty was appropriate in this case.

Petitioner argues that the trial court's analysis violates the rule that a capital defendant is permitted to present all relevant mitigating evidence to the sentencing body. *See Skipper v. South Carolina*, —— U.S. ——, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). Petitioner misconstrues these cases. *Skipper, Eddings*, and *Lockett* require that the defendant be allowed to *present* all relevant mitigating evidence to the sentencing jury or court. In this case, petitioner was given the opportunity to present such evidence. These cases do not require that the sentencing body *accept* the conclusion that the evidence constitutes a mitigating circumstance or that the mitigating circumstances outweigh the aggravating circumstances.

Petitioner argues that the trial court improperly limited its own inquiry by finding that the jury had rejected the mitigating circumstances. The record belies this assertion. First, the trial court noted that it reached its conclusion "after carefully studying, considering, reviewing and weighing all of the evidence in the case at the trial of this matter and at the separate sentencing proceeding...." Trial Transcript, Vol. IV, at D–28. Second, the court "found" that Harich's lack of prior criminal activity was a mitigating circumstance. The court obviously did not feel bound by its perception that the jury had rejected each of the mitigating circumstances. The trial court's findings of fact merely reflect its analysis of the evidence. *Skipper, Lockett*, and *Eddings* do not require this

---

**20.** These were that: (1) the murder was committed during the commission of a sexual battery and kidnapping; (2) the murder was for the purpose of preventing lawful arrest; (3) the murder was especially wicked, evil, atrocious and cruel; and (4) the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.

**21.** These were: (1) the absence of prior criminal activity; (2) the crime was committed while defendant was under the influence of extreme mental or emotional disturbance; (3) a substantial impairment of defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; (4) the age of the defendant; and (5) any other aspect of defendant's character or record and any other circumstance of the offense.

court to review the weight assigned to evidence considered by the sentencing court. The concern of these cases is that the sentencing jury and court *consider* all relevant mitigating evidence. That concern was satisfied in this case.

### B. *Aggravating Circumstances.*

#### 1. *"Cold, Calculated, and Premeditated"*

■ Petitioner attacks Fla.Stat. § 921.-141(5)(i) both on its face and as applied to this case. This provision allows the sentencing court to find an aggravating circumstance where "the ... homicide ... was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification." Petitioner's claim is that this aggravating circumstance does not genuinely narrow the class of persons eligible for the death penalty because first degree murder is, by definition, premeditated. *See Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1982) ("an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder"); *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The constitutionality of this aggravating circumstance is an issue of first impression in this circuit.

The Florida Supreme Court has held that § 921.141(5)(i) does narrow the class of defendants eligible for the death penalty because it requires a "heightened" level of premeditation. *See Card v. State,* 453 So.2d 17, 23 (Fla.1984) ("premeditation must rise to a level beyond that which is required for a first degree murder conviction"), *cert. denied,* 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330; *Jent v. State,* 408 So.2d 1024, 1032 (Fla.1981) ("the level of premeditation needed to convict in ... a first degree murder trial does not necessarily rise to the level of premeditation in subsection (5)(i)"), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982).

This aggravating circumstance, as so construed, provides adequate guidance both to the sentencing court and to the advisory jury. While most capital murders require premeditation, the Florida courts have construed § 921.141(5)(i) to require a greater degree of premeditation and cold-bloodedness than is required to obtain a first degree murder conviction. *See Brown v. State,* 473 So.2d 1260, 1268 (Fla.) ("[cold, calculated] factor places a limitation on the use of premeditation as an aggravating circumstance in the absence of some quality setting the crime apart from mere ordinarily premeditated murder"), *cert. denied,* — U.S. ——, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985). Given this limiting construction, § 921.141(5)(i) is a facially valid aggravating circumstance because it genuinely narrows the class of persons eligible for the death penalty. *Cf. Proffitt v. Florida,* 428 U.S. 242, 252–56, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976) (Florida courts limiting construction of the "heinous, atrocious, and cruel" aggravating circumstance provides adequate guidance to the sentencing court and jury).

■ Petitioner also claims this aggravating circumstance has been applied inconsistently by the Florida courts. In support of this contention, petitioner asks us to compare *Mills v. State,* 462 So.2d 1075 (Fla.) (court found "cold calculation" where defendant stalked his bound and injured victim through underbrush until he found and executed him), *cert. denied,* 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985), with *Drake v. State,* 441 So.2d 1079 (Fla. 1983) (insufficient basis in record to find "cold calculation"; victim was found with her hands tied behind her back and eight stab wounds), *cert. denied,* 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 832 (1984). Although both victims were bound, the different results in these two cases are easily explainable. In *Mills,* a co-defendant testified as to the details of the stalking, binding, and killing. In *Drake,* on the other hand, there was no eyewitness and the defendant did not confess to the details of the killing. The only evidence was that the victim was found with her hands tied be-

hind her back. Thus, the court found there was insufficient basis in the record to justify application of § 921.141(5)(i). The court did not foreclose the possibility that, given more evidence, the murder in *Drake* could have been found to be cold and calculated. Thus, these cases are not inconsistent. *Mills* is also distinguishable from *Harris v. State*, 438 So.2d 787 (Fla.1983), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 563 (1984). In *Harris*, the defendant chased his victim throughout her house, stabbing her repeatedly. Although the defendant arguably "stalked" his victim, as did the defendant in *Mills*, the murder was not "cold and calculated" because the state presented no evidence that the murder was planned in advance. *Id.* at 798. All of the weapons used by the defendant were found by him in the victim's house during the chase. Thus, although the defendant demonstrated sufficient premeditation to justify a finding of first degree murder, he did not display the methodical and calculating behavior required for a finding of heightened premeditation. *Id.*

In short, petitioner's attempts to compare cases which share some, but not many, characteristics is unpersuasive. Qualitatively ranking murders is, to be sure, an imprecise business. The Supreme Court, however, has recognized that such qualitative differences as will make some murders "especially heinous, atrocious and cruel" can be considered in imposing the death penalty as long as there are guidelines for their application by the sentencing court and jury. *See Proffitt, supra.* Similarly, while the line between "ordinary" premeditation and the "heightened" cold, calculated premeditation is a thin one, petitioner has not shown that the state has applied this factor in an unconstitutionally arbitrary manner.

The application of § 921.141(5)(i) in this case is consistent with its application in prior cases. Eyewitness testimony established that Harich had his victims lie down behind his van while he wrapped a towel around his gun. After shooting the two girls, he walked back to his van to retrieve a knife. He then cut each girl's neck, causing the instantaneous death of Carlene Kelley. Under these circumstances, it was not irrational or arbitrary to apply the "cold, calculated" aggravating circumstance in this case. *Cf. Barclay v. Florida*, 463 U.S. 939, 947, 103 S.Ct. 3418, 3423, 77 L.Ed.2d 1134 (1983) (upholding application of "heinous, atrocious, and cruel" aggravating circumstance).

### 2. *To "Avoid Lawful Arrest"*

■ Petitioner alleges that there was insufficient evidence to support the sentencing court's finding that petitioner committed the murder "for the purpose of avoiding and preventing a lawful arrest after compelling Carlene Gail Kelley to perform fellatio on him and after attempting to kill and murder Deborah Miller subsequent to the kidnapping of each of these victims." Record, Vol. IV, at D–29. Petitioner argues that if the "avoid lawful arrest" aggravating circumstance, Fla.Stat. § 921.141(5)(e), applies in this case, it would apply in every case where the murder followed another crime and where the victim saw the accused's face. Such an interpretation would, according to petitioner, render the aggravating circumstance overly broad in violation of the Eighth and Fourteenth Amendments. *See Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

In *Doyle v. State*, 460 So.2d 353 (Fla. 1984), the Florida Supreme Court discussed the parameters of the § 921.141(5)(e) aggravating circumstance. The defendant in *Doyle* raped his next-door neighbor, then murdered her. The trial court found the aggravating circumstance because the victim knew her attacker and would have reported the rape. The state supreme court held that the aggravating circumstance was improperly found on these facts. "[W]here the victim is not a law enforcement officer, the state must prove beyond a reasonable doubt that the dominant motive for the murder was the elimination of witnesses." *Id.* at 358. As construed by *Doyle*, § 921.141(5)(e) certainly narrows the class of persons eligible for the death penalty. *Accord Adams v. Wainwright*, 764 F.2d 1356, 1365–66 (11th Cir.), *cert.*

*denied,* —— U.S. ——, 106 S.Ct. 834, 88 L.Ed.2d 805 (1985).

The issue, then, is whether § 921.-141(5)(e) was arbitrarily or irrationally applied in this case. On direct appeal, only one justice of the Florida Supreme Court believed that there was insufficient evidence in this case to justify a finding that Harich killed to avoid lawful arrest. *See Harich v. State,* 437 So.2d 1082, 1087 (McDonald, J., dissenting). Although the majority did not specifically discuss this issue, the court did note that it had fully considered petitioner's claims that "the aggravating factors should not have been applied" and found them to be without merit. *Id.* at 1086. We can only assume that the majority followed the *Doyle* test and found that the state proved beyond a reasonable doubt that the dominant motive of the killing was the avoidance of lawful arrest.

We follow the Florida court's conclusions. As we discussed in *Adams,* 764 F.2d at 1366, *Doyle* does not stand for the proposition that § 921.141(5)(e) is, as a matter of law, inapplicable in cases where a murder follows a rape. Instead, proper application of this factor depends on the facts and circumstances of the particular case. Here, as in *Adams,* the murder followed a kidnapping as well as a sexual battery. There was sufficient time between the sexual assault and the killing to justify a finding that Harich's dominant motive was to avoid being prosecuted for the assault. Thus, as in *Adams,* this case is distinguishable from *Doyle,* where the contemporaneity of the murder and rape indicated that "the same hostile—aggressive impulses which triggered the initial attack" also colored the defendant's decision to kill his victim. The "avoid lawful arrest" aggravating circumstance is not overly broad as applied to the facts of this case.

### 3. *"Especially Heinous, Atrocious, and Cruel"*

 Finally, petitioner challenges the application of Fla.Stat. § 921.141(5)(h). This provision provides for an aggravating circumstance where the capital felony was "especially heinous, atrocious, or cruel." Petitioner challenges this aggravating circumstance on the grounds that the Florida Supreme Court has "utterly failed to limit the application of this circumstance in any coherent fashion." Appellant's Brief at 48. This is substantially the same argument rejected in *Proffitt v. Florida,* 428 U.S. at 242, 96 S.Ct. at 2960, and we are bound to reject it here.

Petitioner shot his victim in the head after she begged for mercy. He then completed the killing by retrieving a knife from his van and slashing her throat until she was dead. On the facts of this case, we cannot say the aggravating circumstance was irrationally or arbitrarily applied. *See Barclay v. Florida,* 463 U.S. at 947, 103 S.Ct. at 3423.

### VII. SENTENCING INSTRUCTIONS

 The trial court instructed the jury that its sentencing recommendation must be a majority decision. On direct appeal, the Florida Supreme Court recognized that this was a misstatement of Florida law. *See Harich v. State,* 437 So.2d at 1086. In fact, a majority vote is not required for a life recommendation. *Rose v. State,* 425 So.2d 521, 525 (Fla.1982), *cert. denied,* 461 U.S. 909, 103 S.Ct. 1883, 76 L.Ed.2d 812 (1983). A six-six vote is a recommendation for life imprisonment. *Id.*

On direct appeal, the Florida court held that this was harmless error given the fact that the jury voted nine-three to recommend the death sentence. 437 So.2d at 1086. We agree. *See Henry v. Wainwright,* 743 F.2d 761, 763 (11th Cir.1984) (instructing jury that majority vote required not prejudicial where nothing in the record showed that jury was equally divided at any point during deliberation).

### VIII. CONCLUSION

For the foregoing reasons, we remand to the district court for an evidentiary hearing to determine whether petitioner's trial counsel rendered ineffective assistance with respect to the intoxication defense, and if so, the legal consequence of such a

determination. All other aspects of the opinion below are affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

FAY, Circuit Judge, dissenting in part, concurring in part:

While concurring in most of what Judge Clark has written for the court, I most respectfully dissent from the conclusion reached in section IA. My personal conclusion is that defense counsel was not ineffective.

Harich contended at trial that he did not commit these horrible crimes. The jury believed otherwise. Deborah Miller proved to be a most credible witness and made her in-court identification. It is easy to understand why the jury rejected the far-fetched story told by Harich including his "delayed ability" to recall the events of that evening and that he had dropped the girls off at a store about 11:00 P.M.

Defense counsel was faced with an extremely difficult situation. His client denied committing the offenses. He maintained that he remembered the evening and testified concerning his version of what transpired while he was with the two girls. To suggest to the jury that Harich was so drunk that he could not have "intended" the consequences of these acts proved by strong evidence would have been totally contrary to and undermining of the position being taken by Harich himself. Although inconsistent and alternative defenses may be raised, competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury.

By handling the matter the way he did, defense counsel was able to inject the thought of diminished capacity (due to heavy drinking and marijuana) without totally rejecting the testimony of Harich.

The record also convinces me that any more strenuous pursuit of the intoxication defense would have been futile. The events described by Deborah Miller took an extended period of time. The conversation held at the gas station (to which Harich had driven his van), the group ride to a pier, the trip to the woods (where Harich had his marijuana growing), picking marijuana leaves, spreading the marijuana leaves on the hood in an unsuccessful attempt to have them dry (said to have taken about an hour in itself), driving to the spot where Harich forced the girls to perform the sexual acts, the shootings, the cuttings and the return to town all took time. In my opinion, defense counsel would have been foolish to attempt to defend on a theory that Harich was so "bombed" or "out of it" that he was unable to form a mental intent and yet drive his vehicle and engage in all of these activities.

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 90 L.Ed.2d 674 (1984) sets forth the standard regarding claims of ineffectiveness of counsel.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064. No such showing has been made here.

To hold that a hearing is required, under the facts of this case, runs afoul of the warning issued by the Supreme Court in *Strickland* that such intrusive post-trial inquiry will do nothing but encourage the proliferation of such challenges. *Id.* at 690, 104 S.Ct. at 2066. It also renders meaningless the presumption of competence surrounding such representation. *Id.*

Harich tried to convince the jury that he was not with Carlene and Deborah when these repulsive crimes were committed. The jury did not believe him. Now he claims his lawyer should have defended him on the grounds that his capacities were so diminished that he didn't know what he was doing. Such Monday morning quarterbacking or second guessing is precisely what the Supreme Court has said should not be allowed. Harich is not entitled to try a different strategy simply because his first failed.

I would affirm, *in toto*, the denial of relief.